298 So.2d 77

**David R. CORDLE**

**v.**

**STATE.**

**3 Div. 238.**

Court of Criminal Appeals of Alabama.

April 9, 1974.

Rehearing Denied May 21, 1974.

William J. Baxley, Atty. Gen., and David W. Clark, Asst. Atty. Gen., for the State.

John W. Davis, III, Montgomery, for appellant.

HARRIS, Judge.

Appellant was convicted of rape and the jury fixed his punishment at ninety-nine (99) years and one (1) day in the penitentiary. The judgment and sentence were in accordance with the verdict of the jury. The judgment entry recites that appellant pleaded not guilty, but the record shows that at arraignment in open court his court-appointed counsel interposed two pleas: (1) not guilty and (2) not guilty by reason of insanity. The trial was had on both pleas and the court charged the jury on the law of insanity. After conviction and sentence he gave written notice of appeal. He made known to the court that he was an indigent and a free transcript was furnished to him. He retained new counsel to represent him on appeal.

Appellant was first arraigned on February 22, 1972, and on February 24, he filed two motions: (1) motion to quash the indictment on the ground that he could not adequately prepare his defense since the preliminary hearing given him on January

12, 1972, had not been taken by a court reporter though he had requested the committing magistrate to obtain the services of a court reporter, and in connection with this motion to quash, he requested a second preliminary hearing with a court reporter, and (2) a motion to send him to a state hospital to determine his sanity at the time of the commission of the offense and his competency to stand trial. Both motions were overruled and denied by the court on February 25, 1972. Nevertheless, on March 10, 1972, the court ordered a psychiatric examination by the staff at Bryce Hospital to determine appellant's sanity or insanity. On May 1, 1972, the following letter was sent to the circuit judge of Montgomery County:

"STATE OF ALABAMA
DEPARTMENT OF MENTAL HEALTH
BRYCE HOSPITAL
Tuscaloosa, Alabama   35401

| SEAL | SEAL |
| STONEWALL B. STICKNEY, M.D. | GEORGE C. WALLACE |
| COMMISSIONER OF MENTAL HEALTH | GOVERNOR |

May 1, 1972

"Honorable Richard Emmet
Judge of Circuit Court
Montgomery County, Alabama
Montgomery, Alabama

"Cordle, David R.
Our file 03 28 37

"Dear Judge Emmet:

"David R. Cordle was admitted in Bryce Hospital on March 13, 1972, on your order dated March 10, 1972, and is presently a patient in Bryce Hospital.

"After a period of examination, observation, and study, it is the opinion of the hospital staff that the said David R. Cordle is presently sane and competent. It is our further opinion that he was sane and competent at the time of admission in Bryce.

"We are ready to release him and will hold him awaiting the arrival of the sheriff, or any duly appointed officer, to take him into custody.

"Sincerely,

"s/s Donald Smith
Donald Smith, M.D.
Assistant Superintendent

"pk

"cc:  Sheriff Mac Sim Butler
       Montgomery County, Alabama
       Montgomery, Alabama"

Following receipt of the above letter, the court ordered the sheriff of Montgomery County to assume custody of appellant and to transfer him from Bryce Hospital to the Montgomery County jail to stand trial on the charges pending against him.

A subpoena *duces tecum* was issued out of the Circuit Court of Montgomery Coun-

ty directed to the records clerk of Bryce Hospital for the production of all medical records pertaining to appellant's confinement in Bryce Hospital to be used as evidence in his trial. Xerox copies of these medical records properly certified by the assistand superintendent were sent to the court in response to this subpoena and they were introduced in evidence by appellant over the objections of the state.

There was no attempt to take the depositions of the Bryce staff appointed to examine appellant as provided by Title 45, Section 226, Code of Alabama 1940; Sheppard v. State, 49 Ala.App. 398, 272 So.2d 605.

■ The court could have legally refused to admit in evidence the reports of the doctors who made up the Lunacy Commission for the reason these reports were not made under the sanction of an oath and were not intended for general public information. Benton v. State, 245 Ala. 625, 18 So.2d 428; Benton v. State, 31 Ala.App. 338, 18 So.2d 423.

The facts in this case are sordid in the extreme but it is necessary that we dwell on them to some extent.

Around mid-night on November 24, 1971, appellant entered the backdoor of an apartment in East Montgomery. The door was closed but was unlocked. He went into the kitchen and stood for a few minutes listening for signs of life in the apartment. From the kitchen he could see into the livingroom. He saw a rocking chair move in the livingroom but could not see the occupant of the chair. He approached the chair from its back and saw a young girl reading a magazine. He reached out and put his hand over her mouth to keep her from screaming. He took her glasses off and put them on a table and while his hand was still over her mouth, he heard a dog bark somewhere in the apartment. He told the girl he had a knife but if she did what he told her to do he would not hurt her. He told her to walk out the backdoor and they walked out side by side with his hand

still over her mouth. He carried her to his car parked on the street near the apartment and put her in the frontseat and told her to keep her head down on the seat. He drove out on the Wares Ferry Road and turned on a dirt road. He told her to take her clothes off and she asked him to please not do anything to her. He slapped her and told her if she didn't take her clothes off, he was going to rip them off. She then proceeded to undress and after she had removed all of her clothes he told her to get in the backseat. She got on the backseat and he got back there with her and started playing with her breasts. She told him she was fourteen year of age and that she was having her period and to please not do anything to her. He ignored her pleas and got on top of her. She felt his privates make contact with her privates. She was a virgin and the first two attempts he made to gain entry were unsuccessful, but he persisted in his efforts. He finally ruptured her hymen and completed the sexual act. After it was over, he handed her clothes to her and told her to dress and he would take her back home. On the return trip he told her to keep her head down on the frontseat. The car stopped for a traffic light and the victim thought they had gotten back to the place where he had forced her into the car and she raised up and got a good look at her assailant for the first time. He drove her a short distance beyond the frontdoor of the apartment where he had abducted her and he let her out and drove away. She ran into the apartment.

The victim of this rape lived with her mother and brother in the same apartment complex from which she was abducted on the night of the rape but she was baby-sitting for an Air Force captain and his wife in the apartment where appellant found her. She put a four-year-old child and a small baby to bed about nine o'clock that night and put the dog in the bedroom with the children. This was the dog that barked while appellant had his hand over the girl's mouth which frightened him and which moved him to take her out on a

country road. Between twelve thirty and one p. m., the captain and his wife returned to their apartment and found the baby-sitter's pocketbook and glasses, but the girl was missing. The captain went to the girl's apartment to report her disappearance to her mother. While the captain was talking with the girl's mother, the captain's wife called the girl's mother and told her the girl had returned, but she was in a state of emotional shock, distraught and was highly hysterical and needed her badly. The police were alerted and responded immediately. The mother dressed and went to her daughter. The girl was carried to the emergency room of a local hospital. The doctor on duty was informed that the girl had just been raped and he conducted a vaginal examination including a pap smear. He found fresh male fecundating fluid or semen.

A few weeks later the victim was shown a number of photographs of suspects at the Montgomery Police Department and she identified appellant as the man who raped her on the night of November 24, or the early morning hours of November 25, 1971.

On the afternoon of December 27, 1971, three Montgomery police officers went to Wetumpka and found appellant at work at a cotton gin. They identified themselves and told appellant they wanted to talk to him about an incident that occurred in Montgomery on December 24, 1971. They asked him if he wanted to talk with them there or in Montgomery and he told them he would rather talk in Montgomery but he wanted to go by his home in Wetumpka first. Appellant got in the police car with two of the officers and they carried him by his home and then brought him to the detective's office at Headquarters. The third officer drove appellant's car from the cotton gin.

They arrived at Police Headquarters around 4:00 P.M. on December 27, 1971, and the officers immediately gave appellant the rights and warnings extolled in Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694.

After the *Miranda* warnings were given to appellant, he told the officers that he fully understood his rights and that he was willing to answer questions. He thereupon signed a waiver of rights form as shown below:

"CITY OF MONTGOMERY, ALABAMA DEPARTMENT OF POLICE

"David Randall Cordle
NAME

"Police H. Q. Det. Office
PLACE

"Dec. 27, 1971
DATE

"8:20 P.M.
TIME

"Rape
CHARGE

"Before asking you any questions, I must explain to you that you can remain silent, that anything you say can be used against you in court, that you can talk to a lawyer first and that you have the right to the advice and presence of a lawyer even though you cannot afford to hire one. If you cannot afford to hire a lawyer and want to have one present during the interrogation, the Court will appoint one before we question you. If you want to answer questions now, you can do so, but you can stop answering at any time.

"s/s H.W. Gandy
OFFICER

"I fully understand the foregoing statement and do willingly agree to answer questions. I understand and know what I am doing. No promise or threats have been made to me by anyone and no pressure of any kind has been made against me by anyone.

s/s David Randall Cordle"

He then made and signed the following statements:

"December 27, 1971  8:20 P.M.

"Statement of David Randall Cordle W/M age 24, 406 Bridge St., Wetumpka, Alabama, as given to Det. H. W. Gandy of the Montgomery Police Dept. in regards to entering the residence at #20 Turner Place on about 11–25–71 at about midnight, taking a girl from this apartment against her will and taking her in an automobile and carrying her out the Wares Ferry Road near Montgomery East and raping her in the back seat of the car.

"My rights have been explained to me in this case and I understand that I do not have to give this statement unless I wish to do so.

"On this date, I had gotten off work at the Perkins Warehouse and Gin in Wetumpka, Alabama. I think it was around 8 o'clock that night that I got off, we had worked late that day. I did not go home, I come to Montgomery. I had stopped at the little Lounge on Coliseum Blvd. and had drank some beer. I then went to a movie at the Charles downtown. It was pretty late when I got out of the movie. I drove back out the Atlanta Highway, and when I got to Turner Place, I drove through. I thought about the girl at #20 that I had tried back in the summer and I decided to check on her. I looked for the family car and it was not there, so I parked my car near the telephone booth near the service station, and then I walked in behind the apartments. The light was on in #20, but I could not see anyone inside. I checked the back door and it was not locked. I opened it and walked inside. Just as I got in the kitchen, I saw a rocking chair in the living room move and I knew someone was in the chair. I stood still for a little while and then I slipped on over to the chair. I reached around and put my hand over the girl's mouth and at the same time told her not to scream or I would kill her or something to that effect. She had on glasses and I took them and put them on a table and at that time a dog in the apartment started to barking and I got scared and I told her to walk out the back door. I still had my hand over her mouth during this time. I had a little box cutter and I told her that I would cut her throat if she made a sound, but if she did what I said, I would not hurt her. We went to my car which was by the phone booth and I told her to get in and lay down or hold her head down. We left there and I drove out the Wares Ferry Road out past where they are building houses in Montgomery East. Just as I passed Montgomery East, there was a little dirt road to the left, I turned on it and went down there and parked. I told this girl to pull off her clothes and get in the back seat. She tried to get me not to do anything to her but I had built up a head of steam and I could not help myself. She got in the back seat and I then got back there with her. I had sex relations with her and then I told her to put her clothes on and I would take her home. She then put her clothes on and I drove her back to Turner Place and let her out of the car. I then went home.

"Q. What type of car did you have at this time?

"A. A 1969 Lemans.

"Q. Does it have bucket seats?

"A. Yes.

"Q. What color is the seats?

"A. They are dark green.

"Q. What did you have on that night?

"A. I just don't remember.

"Witness s/s H. W. Gandy
        H. W. Gandy 121

"Signed s/s David Randall Cordle
        David Randall Cordle"

There had been a series of rapes and burglaries in Montgomery during the summer and fall of 1971. The police officers

questioned appellant about each of these crimes; however before interrogating him about each case, they gave him the *Miranda* warnings and he executed a waiver of rights form for each separate case as that case was mentioned. This procedure was strictly followed in each separate case until appellant had been questioned in seven or eight cases. Finally at 8:20 P.M. the officers mentioned the present case and the same procedure was carried out resulting in appellant's voluntary confession.

■ Appellant predicates error on the part of the trial court in admitting into evidence his oral and signed confession claiming that he was subjected to long and protracted "custodial interrogation" without the *Miranda* warnings over a period in excess of four hours. This claim is not supported by the record in this case. As above pointed out, appellant was a crime suspect in seven or eight cases of rape and burglaries. As the officers brought up each case they gave appellant the *Miranda* warnings before interrogating him on each separate case. It was only after he indicated his willingness to talk and after expressly waiving his right to counsel did the officers ask him any questions.

■ The grand jury indicated appellant on two charges of rape, three cases of burglary in the second degree, and two cases of assault with intent to ravish. No doubt these seven cases, and probably others, were discussed with appellant during the four-hour period leading up to his confession in the present case. During this period of interrogation he was given food and a drink of his choice. Appellant complains that since the state did not offer in evidence the waiver of rights form on any other case, this tends to prove that he was interrogated for four hours before a confession was extracted from him in the instant case and, therefore, the confession was involuntary. Had the state offered such proof this would have been evidence showing separate and distinct crimes in one prosecution and would have constituted reversible error unless such criminal acts were relevant to the crime charged as bearing on scienter, intent, motive, res gestae, or the identity of the accused. Lambert v. State, 48 Ala.App. 600, 266 So.2d 812; "The Law of Evidence in Alabama" by Judge J. Russell McElroy, Vol. 1, 2d Ed. pp. 166–169; 6 Ala. Digest Criminal Law ☞365.

The procedure followed by the police officers in this case fully complied with Miranda v. Arizona, supra.

Appellant insists the trial court committed reversible error in not affording him a full transcription of the proceedings at his preliminary hearing. Before the preliminary hearing he moved the magistrate for the appointment of a court reporter to record the testimony. This motion was denied. He renewed this motion in the circuit court seeking a second preliminary hearing. This motion, too, was denied.

■ A preliminary hearing is a critical stage in the criminal process in Alabama and at such a hearing the appointment of counsel is required for indigent defendants. Coleman v. Alabama, 399 U.S. 1, 90 S.Ct. 1999, 26 L.Ed.2d 387.

■ For well over a hundred years the preliminary hearing procedure in this state required the magistrate, or someone under his direction to reduce to writing the testimony of the witnesses both for the defendant and the state and to have the witnesses sign their names to their respective statements. Title 15, Section 135, Code of Alabama 1940. The Legislature saw fit to repeal this section by Act No. 1106, General Acts of Alabama 1969, approved September 12, 1969. There is no other statute requiring the recording and transcription of the testimony had and taken at a preliminary hearing in Alabama. Williams v. Jasper, 287 Ala. 237, 250 So.2d 701.

No error was committed by the trial court in overruling and denying appellant's request for a second preliminary hearing

and the appointment of a court reporter to record and transcribe the proceedings.

Appellant did not testify in his behalf but was contented to offer character witnesses and the testimony of a psychiatrist. The psychiatrist saw and examined appellant in the Montgomery County jail on two occasions, viz., March 7 and May 9, 1972. The psychiatrist was with appellant about an hour on each occasion. His diagnosis was "schizophrenia with paranoid tendencies."

The doctor further testified that in his opinion appellant did not have the mental ability to distinguish between right and wrong on the night he committed the rape and that he did not have the ability to distinguish between right and wrong on the two occasions he examined him in the county jail. The doctor said appellant did not have a criminal intent at the time he took the girl on November 24 or 25, 1971.

The doctor further testified that the origin of appellant's onset of mental illness dates from an episode in his life when he was fourteen years of age. The doctor described the incident as follows:

"That goes way back to his childhood, and I'll try to find evidence here and read it to you as I received it from the patient . . . I have a lot here, but it all amounted to the fact that when he was about 14 years old, he was lying in his bedroom and he looked across the way to another building, and he saw a woman undress before the window and dance and carry one. He was sort of surprised by this, and so he went out and got a closer look. He went close to the window, which was open, and the woman saw him and told him to come in the room, and she began to undress him and made him lie on the bed next to her, and made him finally submit to relations; and after he had done that, she left, presumably to go to the toilet, and he hurried out of there as fast as he could. From that time on, he had a compelling desire to see women undress, and when

they undressed, it aroused such a sexual fervor, that he masturbated at the same time. This impulse would only seize him at certain times. Other times, he would be perfectly normal. But when the impulse came, he had no control over it whatsoever, and he submitted to his own impulses. That, I think, was the origin of the whole business."

■ The defense of insanity · has been ruled on by the appellate courts of this state in many cases and on numerous occasions. From Wingard v. State, 247 Ala. 488, 25 So.2d 170, we take the following:

"The defense of insanity must be clearly prove to the reasonable satisfaction of the jury and the burden is on the defendant to do so. Code, 1940, Title 15, § 422; Boyle v. State, 229 Ala. 212, 154 So. 575; Lee v. State, Ala.Sup., 20 So.2d 471; Reedy v. State, Ala.Sup., 20 So.2d 528.

"There is no sanction in our law of emotional insanity as an excuse for crime. Coffey v. State, 244 Ala. 514, 14 So.2d 122; Reedy v. State, supra.

"We repeat the well-known rule that to sustain the defense of insanity the evidence must establish that at the time of the commission of the crime the defendant was afflicted with a diseased mind to the extent that (1) he did not know right from wrong as applied to the particular act in question, or (2) if he did have such knowledge, he, nevertheless, by reason of the duress of such mental disease had so far lost the power to select the right and to avoid doing the act in question as that his free agency was at the time destroyed, and (3) that, at the same time, the crime was so connected with such mental disease, in the relation of cause and effect, as to have been the product of it solely. Parsons v. State, 81 Ala. 577, at pages 596, 597, 2 So. 854, 60 Am.Rep. 193."

The oral charge of the court thoroughly covered the law of insanity in criminal

prosecutions and there was no error in refusing the written charge on this subject. Title 7, Section 273, Code of Alabama 1940.

 There was no error in the rulings of the trial judge with reference to the unsworn medical report from the doctors at Bryce Hospital. In 31 A C.J.S. Evidence § 200, page 568 this rule is stated to be that "a witness cannot testify to facts of which his knowledge is derived from the unsworn statements of others, * * *."

We have carefully searched the record for errors injuriously affecting the substantial rights of appellant and have found none. The case is due to be affirmed and it is so ordered.

Affirmed.

All the Judges concur.