620 So.2d 62 (1992)
Vernon MADISON, Sr.
v.
STATE.
CR-90-336.
Court of Criminal Appeals of Alabama.
August 21, 1992.
Rehearing Denied September 30, 1992.
Certiorari Quashed April 16, 1993.
Paul Brown, Mobile, for appellant.
James H. Evans, Atty. Gen., and Melissa G. Math and P. David Bjurberg, Asst. Attys. Gen., for appellee.
Alabama Supreme Court 1920054.
PATTERSON, Presiding Judge.
The appellant, Vernon Madison, Sr., was indicted on May 20, 1985, in Mobile County, in a two-count indictment for the capital offense of murder of a police officer while the officer was on duty or was performing an official or job-related act, knowing that the officer was on duty or was performing an official or job-related act, in violation of § 13A-5-40(a)(5), Code of Alabama 1975.[1] The indictment reads, in part, as follows:

*63 "[COUNT ONE]
"The GRAND JURY of said County charge, that ... VERNON MADISON... did, with the intent to cause the death of Julius Schulte, cause the death of Julius Schulte by shooting him with a gun, while the said Julius Schulte, a police officer of the City of Mobile, Alabama, Police Department, was on duty as a police officer, and the said VERNON MADISON did at such time know that Julius Schulte was on duty as a police officer, in violation of § 13A-5-40(a)(5) of the Code of Alabama....
"COUNT TWO

"The GRAND JURY of said County charge, that ... VERNON MADISON... did, with the intent to cause the death of Julius Schulte, cause the death of Julius Schulte by shooting him with a gun, while Julius Schulte, a police officer of the City of Mobile, Alabama, Police Department, was performing an official or job-related act, to-wit: responding to a citizen's complaint filed by Cheryl Greene, and the said VERNON MADISON did at such time know that Julius Schulte [w]as a police officer and performing an official or job[-]related act, in violation of § 13A-5-40(a)(5) of the Code of Alabama...."
To the indictment, Madison pleaded not guilty and not guilty by reason of mental disease or defect. On September 12, 1985, a jury found him guilty of the capital offense charged in the indictment and, after a sentencing hearing, returned an advisory verdict recommending the death penalty by a vote of 11 to 1.[2] The trial court, after a second sentencing hearing, adjudged Madison guilty and sentenced him to death.
On appeal of that conviction and sentence, we remanded the case to the trial court with instructions that that court conduct a hearing pursuant to Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), Griffith v. Kentucky, 479 U.S. 314, 107 S.Ct. 708, 93 L.Ed.2d 649 (1987), and Jackson v. State, 516 So.2d 768 (Ala.1986), to determine if the state had exercised its peremptory jury strikes in a racially discriminatory manner. The trial court conducted the hearing in accordance with our instructions and determined that the prosecuting attorney's explanations for the strikes were sufficient to overcome the presumption of discrimination that existed and that the explanations were race-neutral. Upon review, we found the findings of the trial court in this regard to be clearly erroneous, and we reversed its judgment and ordered a new trial. Madison v. State, 545 So.2d 94 (Ala.Cr.App.1988).
The new trial began on September 10, 1990, and on September 14, 1990, the jury found Madison "guilty of the capital felony as charged in the indictment." After a sentencing hearing held in accordance with §§ 13A-5-43 through -46, Code of Alabama 1975, the jury recommended the death penalty by a vote of 10 to 2. Thereafter, the trial court conducted another sentencing hearing pursuant to §§ 13A-5-47 through -52, and, after making specific findings on the existence or nonexistence of the aggravating and mitigating circumstances, weighing those circumstances, and considering the jury's recommendation, it again sentenced Madison to death.
The state's evidence showed as follows. On the date of the commission of the crime, April 18, 1985, Cheryl Greene and her 11-year-old daughter, Kimberly Hughes, resided at 1058 Etta Avenue in Mobile. The appellant, who was involved in a relationship with Cheryl, had also resided at this residence until a few days before the date of the commission of the offense charged in the indictment, when the relationship between Cheryl and the appellant apparently *64 ended and the appellant moved out, leaving his personal belongings.
On the afternoon of April 18, 1985, Cheryl reported to the Mobile police that Kimberly was missing. Juvenile Officer Julius Schulte, the victim, was dispatched to the Greene residence to investigate the missing child complaint. When Officer Schulte arrived at the Greene residence, he discovered that the child had returned home; however, he found himself in the midst of a domestic dispute between Cheryl and the appellant. The appellant had earlier come to get his personal belongings, but when he learned that Kimberly was missing, he had left to look for her. He returned around 6:30 p.m., after Officer Schulte had arrived. Mary McCord, a former girlfriend of the appellant, had brought him and had parked her automobile some distance from the Greene residence. The appellant had left his .32 caliber pistol with Mary and had proceeded to the Greene residence on foot.
When he arrived, Madison saw Cheryl packing his clothing, and she asked him to leave. He was upset because the policeman was present. He said, "Why you call the cops?" and "Why in the hell did you call the police on me?" Cheryl was also packing some "things" for herself and Kimberly because she was planning to leave the residence for a few days because she was afraid of the appellant. One of Cheryl's friends asked Officer Schulte to remain on the scene until Cheryl and the child were safely away from the appellant. The appellant and Cheryl came out of the residence into the street and talked with Officer Schulte, who had remained in his police car. This car was unmarked, but it had a police radio antennae on the trunk and a "municipal" license tag. The appellant kept hollering, "I can't believe you called the cops." Officer Schulte kept telling the appellant to get his things and leave. The appellant told him that the police were not needed. The officer told the appellant if he was having a domestic dispute, the best thing for him to do was "just to go on and let things cool down." The appellant replied, "O.K., I'm gone." Then he left.
Thereafter the appellant went to where he had left Mary McCord, obtained his pistol from her, and immediately returned to the scene by a circuitous route. He approached the police car from the rear and, without warning, fired two shots into the back of Officer Schulte's head, wounding him severely. The officer died from these wounds a few hours later. After shooting Officer Schulte, the appellant pointed the gun at Cheryl as she ran away. He fired and she was struck in the back and fell. He straddled her as she lay in the street and fired several more shots, saying, "I'll show you bitch" and "You bitch, if you want to play this game I can play it too." The appellant then fled the scene on foot. Shortly after the shooting and some distance away, the appellant sought assistance from Ollie Doss. He approached her and told her that he had just shot a cop and asked her to take him to Bay Minette.
Four witnesses testified that they observed the appellant talking with the victim just before the shooting and heard the victim tell the appellant that he should get his clothes and leave. One of these witnesses testified that the appellant told the victim that he was not needed and that the victim told the appellant that he was there because of the report about Kimberly. He further testified that, when he told the appellant that he should do what the officer said, the appellant said, "O.K." Another witness testified that he heard the appellant tell the victim "O.K." and "that he was going to do so." Three of the witnesses testified that they saw the appellant leave; that in a few minutes he returned; that he approached the police car from the rear and from close range fired two shots from a pistol into the back of the victim's head. The witnesses testified that, at all times, the victim had been calm and had not abused or threatened the appellant.
When the appellant was arrested the following day, a .32 caliber pistol was seized from the automobile in which the appellant was riding. This pistol was determined to be the weapon that fired the two bullets that were recovered from the victim's head. It was a single shot revolver which had to be "cocked" each time before firing. In *65 addition, the appellant's fingerprints were found on the top of the victim's automobile on the driver's side.
James Orso, deputy chief of police in charge of the juvenile division and the victim's supervisor, testified that the victim was on duty when he was shot, that he was in plain clothes, and that he was required to wear a pocket badge on the lapel of his coat. Kimberly Hughes testified that the officer's coat, which was draped over the seat of the car, had a police badge that was attached to the pocket and that was in plain view. Officer John Joseph Wynne, who arrived at the scene immediately after the shooting, testified that the victim wore a coat with a pocket police badge hanging from the upper coat pocket with the words "Mobile Police Department" embroidered under it. He further testified that the victim, who had been shot in the left temple, was sitting in the automobile, that the headlights and interior lights were on, that the engine was running, and that the victim's pistol was in a holster on the front seat. Lieutenant George H. Goodwin of the Mobile Police Department testified that when an officer becomes involved in a volatile situation, he must be guided by department procedural general orders and his experience. A copy of the pertinent general orders were introduced into evidence.
The appellant did not testify in the guilt phase of his trial. He conceded in counsel's opening statement and final argument that there was no dispute about the actual shooting; he admitted through counsel that he shot Officer Schulte. His defense, which is discernable from counsel's statements and arguments, from cross-examination of state witnesses, and from testimony of the appellant's witnesses, was (1) that the state failed to prove beyond a reasonable doubt that, at the time of the shooting, the appellant knew the victim was a police officer on duty or a police officer performing an official or job-related act, and (2) that at the time he shot the victim, he was not legally responsible for his conduct because, he says, he was suffering from a mental disease or defect to such an extent that he lacked the substantial capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law.[3]
In support of his claim that he did not know the victim was a police officer on duty, the appellant offered the testimony of Simon Taylor. Taylor stated that he was the appellant's friend; that the appellant came to his house immediately after the shooting, told him that he had shot a man, and asked him to go see how bad it was; and that he did so, came back, and told the appellant that a "detective" had been shot. He stated that the appellant said "damn" and dropped his head.
In support of his insanity plea, the appellant presented the deposition of Dr. Robert M. Ritter, a psychiatrist, who as a psychiatrist for the Mississippi prison system examined the appellant when the appellant was an inmate in Mississippi. Dr. Ritter testified that he had examined the appellant on October 4, 1974, and that, after having talked with him for 15 to 30 minutes on that occasion, he had decided that the appellant was psychotic. He found that he was suffering from a "paranoid illness of profound proportion." He concluded that the appellant was suffering from a delusion that people around him were there to harm him and that, if he felt threatened, he would stab them. He had seen the appellant during the period from October 4, 1974, to December 13, 1974, and he saw *66 him last on August 31, 1979. On August 31, 1979, he had given the same diagnosis, presuming that the appellant was in the same condition. He admitted on cross-examination that his visits with the appellant had been short, that he had taken no exhaustive history, that he had seen the appellant under less than desirable conditions, and that he had not been able to do "all the things" he would have liked to have done. He stated that "psychotic paranoid state mental illness" is not curable, but that it can be kept in remission by medication. He gave his opinion that the appellant's condition is treatable by medication, and that, if he had not been taking medication from 1979 to 1985, he would have been in a psychotic state at the time of the murder. He further stated that if the appellant were in such a state, he would exhibit violent behavior. His opinion of the appellant's present condition was that the appellant was suffering from a "designated delusional paranoid disorder persecutory type," a "chronic psychotic condition." He concluded that, in his opinion, on the date of the shooting, April 18, 1985, the appellant would not have been able to appreciate the criminality of his conduct and would have been unable to conform his conduct to the requirements of the law.
Terri Luker, a state probation and parole officer, who was the appellant's parole supervisor in 1985, testified for the defense that the appellant had reported to him once each month, that he had been punctual, and that his monthly urine test results had always been negative. Luker testified on cross-examination that the appellant had never conducted himself in such a way as to suggest that he was suffering from a mental disease or defect.
Dr. Barry C. Amyx, a psychiatrist, also testified for the appellant. He had interviewed the appellant in the Mobile County jail for approximately one and one-half hours on July 12, 1990, and had examined the psychiatric reports and findings of other medical experts including Dr. Ritter, Dr. Clyde Van Rosen, Dr. Harry Albert McClaren, and Dr. Claude L. Brown. He testified that, in his opinion, the appellant was suffering from a psychotic illness that he described as a "delusional disorder, persecutory type." He stated that the appellant had a history of false beliefs that he was being persecuted and of fears that people were trying to harm him. He was of the opinion that the appellant thought that he had killed the victim in self-defense. He testified that, in his opinion, the appellant did not appreciate the criminality of his act in shooting the victim. He disagreed with the opinions of the state's experts who had found that the appellant was not suffering from a mental disease.
In rebuttal, the state presented Dr. Clyde Van Rosen, a clinical psychologist, who had examined the appellant in September 1985 for seven hours and who had performed several psychological tests on him. He determined that the appellant had an intelligence quotient of 84, and he had found the appellant to be well-oriented, alert, and aware of what was happening. He was of the opinion that the appellant had deliberately tried to make the test results look bad. He stated that the appellant had given a detailed and full account of the events of the night of April 18, 1985, leading up to the shooting, but had claimed that he could not remember the shooting. He stated that he had found no evidence of delusional thought and that he did not think that the appellant had been psychotic. He was of the opinion that the appellant suffered from two personality disorders: (1) "anti-social personality disorder," and (2) "paranoid personality disorder." He testified that, in his opinion, the appellant did not suffer from a mental disease or defect and that, on the date of the killing, he was able to conform his conduct to the requirements of the law. He stated that the appellant's actions at the time of the shooting indicated knowledge of what he was doing and control of his actions. Obviously referring to the appellant's expert witness, he stated that the opinion of a psychiatrist without the benefit of psychological testing would be flawed.
Dr. Harry Albert McClaren, a psychologist, also testified in rebuttal for the state. He testified that he had spent seven to eight hours with the appellant on September *67 7 and 8, 1990, and had administered numerous psychological tests. He had reviewed records pertaining to the appellant and had talked with a number of people who knew the appellant, including Cheryl Greene and jail personnel. He testified that, in his opinion, the appellant was suffering from a personality disorder as distinguished from a mental illness. He was of the opinion that, at the time of the shooting, the appellant did not have a psychosis, could appreciate the criminality of his conduct, and could conform his conduct to the requirements of the law. He disagreed with the conclusions reached by the appellant's expert witnesses, Drs. Ritter and Amyx.
Dr. Claude L. Brown, a psychiatrist, also testified for the state in rebuttal. He had interviewed the appellant on August 30 and September 5, 1985, in the Mobile County jail. He had spent approximately one hour with him on each occasion. He stated that the appellant had told him that he had "blacked out" at the time of the shooting. He testified that the appellant had not told him that the victim had reached for a weapon. Dr. Brown found no evidence of "delusional thinking" or of a psychosis and concluded that the appellant was suffering from a "paranoid and anti-social personality disorder." He testified that it was his opinion that, on the night of the crime, the appellant had the capacity to appreciate the criminality of his conduct and to conform his conduct to the requirements of the law.
We observe that the evidence of insanity offered by the appellant, in the light of all the evidence, was not clear, convincing, and undisputed; the issue of the appellant's mental state at the time of the crime was clearly an issue to be submitted to the jury. See Cunningham v. State, 426 So.2d 484 (Ala.Cr.App.1982). Two defense psychiatrists testified that, because of a mental disease or defect, the appellant lacked the capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law at the time of the commission of the offense, while two psychologists and a psychiatrist, testifying for the state, testified that the appellant was not suffering from a mental disease or defect and that the appellant could have appreciated the criminality of his conduct and could have conformed his conduct to the requirements of the law at the time the offense was committed. The state's experts concluded that the appellant was suffering from a personality disorder rather than from a psychosis. Moreover, Dr. Ritter, a defense witness, had last seen the appellant in 1979, six years before the commission of the offense, and he based his opinion upon a presumption that the appellant's condition, which he had observed in 1979, had continued until the present time. His opinion was based largely upon information supplied him by the appellant, and he conceded that his visits with the appellant had been brief and under less than desirable conditions, that he had taken no exhaustive history, and that he lacked the information that could have been obtained from psychological testing. In addition, Dr. Amyx's opinion was based upon a brief interview with the appellant five years after the crime and a review of the findings and reports of the other experts. On the other hand, state's witness Dr. Rosen had spent seven hours with the appellant five months after the murder and had conducted numerous psychological tests. Dr. McClaren, although examining the appellant five years after the crime, had spent seven to eight hours with him, had conducted psychological tests, had reviewed other medical and nonmedical records, and had talked with people who knew and associated with the appellant. Dr. Brown had interviewed the appellant for two hours within five months of the murder. Terri Luker, the appellant's parole officer, Alan Long, a corrections officer, and Paul Douglas Bivins, a psychologist with the state prison departmentpersons who had considerable contact with the appellanttestified that they had never observed any conduct to suggest that the appellant was suffering from a mental disease or defect. Long had seen the appellant daily for five years and had used him as a "hall runner" because he could get along with other inmates. Bivins had seen him weekly for five years.
*68 The appellant appeals his conviction and death sentence, raising numerous issues. Because we find it necessary to reverse this case, we will address only one issue.
The appellant contends that reversible error occurred when Dr. McClaren was permitted, in the guilt phase of the trial, to state his opinion of the appellant's mental condition at the time of the commission of the offense when his opinion was based, in part, on information not in evidence. He relies on the rule stated in Ex parte Wesley, 575 So.2d 127 (Ala.1990). No objection in this regard was made to Dr. McClaren's testimony when it was given; thus, we must review this issue under the plain error rule, A.R.App.P. 45A. (The issue was raised for the first time in the appellant's motion for a new trial, which was overruled by the trial court; this objection, however, does not take our review out of the plain error rule because it was untimely.)
We begin our analysis with the following observations:
"The traditional rule in this county has been that an expert, in giving his opinion, cannot rely upon the opinion of others. The basis for this rule of exclusion has been that such testimony is based upon what others have said, and, consequently, constitutes hearsay. In light of this rule a physician-witness' testimony to his opinion with respect to the condition of his patient may not be supported by testimony by such witness that certain opinions or reports ... concerning the patient had been made to him by other physicians."
Brackin v. State, 417 So.2d 602, 606 (Ala. Cr.App.1982) (quoting C. Gamble, McElroy's Alabama Evidence § 110.01(3) (3d ed. 1977)). Alabama has followed the traditional rule. Carroll v. State, 370 So.2d 749 (Ala.Cr.App.), cert. denied, 370 So.2d 761 (Ala.1979); Hurst v. State, 356 So.2d 1224 (Ala.Cr.App.1978); Cordle v. State, 53 Ala. App. 148, 298 So.2d 77, cert. denied, 292 Ala. 717, 298 So.2d 85 (1974), cert. denied, 419 U.S. 1033, 95 S.Ct. 516, 42 L.Ed.2d 309 (1974). However, in Nash v. Cosby, 574 So.2d 700 (Ala.1990), the Alabama Supreme Court modified the traditional rule by allowing a medical expert to give opinion testimony based in part on the opinions of others when those other opinions are found in the medical records admitted into evidence. However, as the Alabama Supreme Court noted in Ex parte Wesley, Nash did not change "the traditional rule followed in Alabama that the information upon which the expert relies must be in evidence," 575 So.2d at 129 (footnote omitted). In Ex parte Wesley, the expert, in giving his opinion on the mental condition of the defendant in that case, based his opinion in part on police reports and medical records that were not in evidence. Following the traditional rule, as modified, the Wesley court found the expert's testimony inadmissible. More recently, in W.S. v. T.W., 585 So.2d 26 (Ala.1991), Justice Houston, the author of the opinion in Ex parte Wesley, in an effort to clarify the rule in Alabama, stated in a concurring opinion, as follows:
"It is my understanding that an expert witness may give opinion testimony based upon facts of which he has personal knowledge; based upon opinions of others, if these are opinions of a type customarily relied upon by the expert in the practice of his profession; or based upon facts that are assumed in a hypothetical question. In any event, the facts known to the expert, the opinions of others of a type customarily relied upon by the expert in the practice of his profession, and the hypothesized facts must all be facts in evidence."
585 So.2d at 29.
In the instant case, as we have previously stated, the prosecution presented in rebuttal the testimony of Dr. McClaren, a psychologist, who gave his opinion that, at the time of the commission of the offense charged, the appellant was not suffering from a psychosis, that he could appreciate the criminality of his conduct, and that he could conform his conduct to the requirements of the law. As we shall hereinafter see, Dr. McClaren based his opinion partly on information that was not offered or admitted into evidence during the trial.
The record shows the following:

*69 "Q. [District Attorney Galanos on direct examination]: And on what dates in September did you evaluate Vernon Madison, Doctor?
"A. [Dr. McClaren]: On September 7th and September 8th.
"Q. We're talking about last week, literally?
"A. That's right. Last Friday and Saturday.
"Q. Doctor, what did your evaluation of Mr. Madison consist of?
"A. I interviewed him at length. Also I did psychological testing. I did the Weschler Adult Intelligence Scale Revised, the best intelligence test we have. I used the Minnesota Multi-Phasic Personality Inventory, one of the most frequently used, most objective tests of personality that we have. Also, in addition to talking with Mr. Madison at length and in a manner that I thought we were both comfortable with each other.
"I talked with the mother of his child by telephone. I also talked with a woman with whom he had been living prior to the time of the alleged homicide who had known him for a number of months before the homicide and who was there at the time according to her report. I also talked to Lieutenant Boone, one of the arresting officers that took Mr. Madison into custody and who interviewed him after he was arrested and advised of his constitutional rights.
"I also had access to prison records from Mississippi State Prison in Parchman. Also I had access to other records from the Atmore, Alabama vicinity in regard to Mr. Madison. I saw an affidavit from the psychologist who had done monitoring [of] him near Atmore. I also saw portions of histhe allegations against him. I did not see the complete police file. I also talked with the chief jailer as well as a lower level or corporal jailer who had more contact with Mr. Madison about his jail adjustments since he had been here in Mobile County.
"So these are the things that I did to try to understand Vernon Madison and especially to understand his mental state at the time of this.
"Q. So when you evaluated Vernon Madison, you did more than just sit down and talk to Vernon Madison?
"A. Absolutely.
"Q. How important is it to a meaningful psychological evaluation to avail yourself with collateral data such as talking to people who knew him, talking with the officer who took him into custody, and having access to these records and reviewing them?
"A. In my view, it's crucial. The way I do my work, I make every effort to get this kind of information. Sometimes you are not able to get much. Other times you have quite a bit. In this instance, I was able to get quite a bit of information and felt like I was able to do a very thorough evaluation of Mr. Madison.
". . . .
"Q. (By Mr. Galanos) I want you to relate for us again the components of your evaluation. What were the ingredients that went into whatever conclusion you'll testify to later?
"A. I interacted with Mr. Madison on four different occasions or five if you count two occasions on the same day we took a break for lunch. So I saw him on different days and at different times of the day.
"Q. And what was the total time, if you were to consider the time you spent with him in August and the time you spent with him last week that you spent with Vernon Madison?
"A. Approximately seven hours. That would beI would say closer to eight, if you consider the time in August as well..... No less than seven and certainly no more than eight.
"Q. And did you perform any tests?
"A. Yes, I did.
"Q. And the names of the tests please, sir.
"A. The Weschler Adult Intelligence Test Revised, and the Minnesota Multi-Phasic Personality Inventory.
"Q. And in addition to that, what collateral data did you have at your disposal?

*70 "A. I talked with two jail personnel that were knowledgeable in regards to his jail adjustment. One much more so than the other. One being a chief jailer responsible for all the jail inmates. The other being a corporal that had more day-to-day contact with the Defendant.
"Q. Did you talk to anybody that knew the Defendant personally?
"A. Yes, I did.
"Q. Who was that?
"A. I talked to Cheryl Greene who had lived with Mr. Madison for a number of months prior to the time of the killing. Also I talked with the mother of his child who had known him for many years.
"Q. Would that be Ms. Mary McCord?
"A. Yes.
"Q. And I believe you testified earlier that you also talked to Lieutenant Boone, who was with him on the night of the arrest; is that right?
"A. I talked with Lieutenant Boone. Also I heard an audio tape of his statement.
"MR. BROWN: Judge, I object, please.
"Q. (By Mr. Galanos) And what records did you review, sir?
"A. I review[ed] records from Parchman, Mississippi, from Holman, Alabama, a report from Dr. Brown, report from Dr. Van Rosen, a report from I believe Dr. Amyx, a memo or statement from Paul Bivins who [had] been monitoring Mr. Madison in Holman, then I had reviewed some transcripts of court proceedings.
"Q. Did you also have access, sir, to records from Mississippi, specifically the records and findings of Dr. Ritter and Dr. Croce?
"A. Yes, I did.
"Q. So these were the tools that you had at your disposal when you conducted your evaluation?
"A. That's right."
After reviewing the record, we find that the following information, upon which Dr. McClaren relied in arriving at his opinion of the appellant's mental condition, was not introduced into evidence: the information received from Mary McCord, the mother of the appellant's child; the information received from Cheryl Greene, his girlfriend; the information received from Lieutenant Boone, who arrested the appellant and took a statement from him; the information received from the chief jailer and from his assistant concerning the appellant's conduct while incarcerated in the Mobile jail; a memorandum or statement from Paul Bivins, a state psychologist who had observed the appellant weekly for five years at Holman prison,[4] portions of the "police file"; records from "the Atmore, Alabama vicinity," presumably the same as those referred to as from Holman prison; a taped statement made by the appellant to the police shortly after he was arrested for the commission of the crime; and "some transcripts of court proceedings." Mary McCord testified as a witness for the state in the guilt phase of the trial; however, she did not testify about her conversation with Dr. McClaren. Cheryl Greene did not testify; hence, we do not know what she told Dr. McClaren. Lt. Boone testified only during a hearing out of the presence of the jury, on the matter of the voluntariness of the appellant's statement. The chief jailer and his assistant were never identified and did not testify. Paul Bivins testified and gave his opinion that, on the occasions on which he had observed the appellant, the appellant did not appear delusional; however, he did not testify as to the contents of his memorandum or statement seen by Dr. McClaren. The police records and the Holman prison records were not introduced. The appellant's taped statement was withdrawn by the state after an unsuccessful attempt to have it admitted; thus, it was never admitted into evidence. Finally, no transcript of any court proceeding was introduced for the jury's consideration. We note that no attempt was made to introduce *71 any of the above information, except the appellant's statement.
From his opening statement to his final summation during the guilt phase of the trial, the prosecutor urged the jury to give special weight and consideration to Dr. McClaren's testimony. In his opening statement, the prosecutor stated, "And last and certainly not least, this very past Saturday, Dr. Harry McClaren, a forensic psychologist from the State of Florida, evaluated Vernon Madison and found him to be sane." In his questioning of Dr. McClaren, he brought out the importance that Dr. McClaren placed on the extensive so-called "collateral data" in forming his opinion, such as talking with people who knew the appellant, talking with the officer who took him into custody, and having access to the records pertaining to the appellant. In answering the prosecutor's question, Dr. McClaren testified that this type of information was "crucial" in making "a very thorough evaluation" of the appellant. In his final argument in the guilt phase, the prosecutor emphasized the importance of Dr. McClaren's resort to this extensive "collateral data" by stating:
"We had two people evaluate him right after this happened in '85. But to make sure last week this very last week September 7, September 8, Dr. McClaren went and evaluated Vernon Madison. He said and this again is after spending a great deal of time in administering tests and reviewing all the collateral data. Harry McClaren is the only one to have talked to Mary McCord, the only one to have talked to the police who saw him shortly after this happened, the only one to talk to Cheryl Greene."
Moreover, we note that the prosecutor even acknowledged the critical relevance of the appellant's statement when, in arguing for the statement's admission, he stated that he was offering the statement for the limited purpose of showing the appellant's demeanor and state of mind four hours after the crime had been committed and, thus, to rebut his insanity plea.
The trial court's jury instruction about the jury's consideration of an expert witness's testimony, which is as follows, further illustrates the significance of the jury's lack of opportunity to consider the wealth of information upon which Dr. McClaren based his opinion:
"In passing upon the facts, you are not required to accept the conclusions or expressed opinions of expert witnesses. But [you] must determine for yourself the weight to be given to such testimony and evidence when considered in connection with all of the other evidence material to the issues in this case. The opinion testimony of experts must be weighed by the jury and, as I stated, should not be arbitrarily rejected.
"Now, the witnesses who have testified in this case as experts again have expressed opinions based upon assumed facts which were set forth in hypothetical questions as presented by the lawyers to them. The weight to be accorded such testimony is dependant entirely upon the truth of the material facts stated in those hypothetical questions and before considering the opinions of the experts, you should first examine carefully all material facts stated in these hypothetical questions and be reasonably satisfied that they have substantially been proven to be true."
It is clear from the evidence in this case that Dr. McClaren's opinion was based partly on reports, records, and information obtained from third parties, which neither were in evidence at the time he testified nor were subsequently admitted. It is also apparent that Dr. McClaren considered these reports, records, and information as critical in arriving at his opinion. The inescapable conclusion is that Dr. McClaren's opinion was based substantially on information not available for the jury's consideration, and thus, in accordance with the rule of evidence discussed above, his testimony was inadmissible. See Ex parte Wesley.
The trial court, in its order denying the appellant's motion for a new trial, endeavors to distinguish the instant case from Wesley. However, the similarities between the two cases are remarkable. Both cases arose in the same court, with the same *72 judge, prosecutor, and expert witness, Dr. McClaren. Similar questions were asked of Dr. McClaren by the prosecutor, and similar answers were received. The same principle of law is involved in both cases; for all practical purposes the cases are on all-fours, except that a timely objection was made to Dr. McClaren's testimony in Wesley. We should point out that the prosecutor and the trial court did not have the benefit of Wesley at the time of the trial in the instant case, because that decision was not announced by the Alabama Supreme Court until several days after the trial.
The trial court found in the instant case that Dr. McClaren "was able to render an expert opinion based on facts in evidence and his personal observation of the defendant independent of any collateral data."
The court, in reaching this conclusion, refers to the following question and answer:
"Q. [District Attorney Galanos]: What, if any, significance are these facts to you: 1) that the Defendant told Officer Schulte `I'm gone,' and appeared to walk away; 2) that when he walked away, he only went far enough to the corner to get a gun; 3) that when he returned, he did not come back down the street, but rather down several backyards; and 4) [that he] approached the officer from the rear; 5) ... that the Defendant left the scene immediately[; 6) t]hat when he left the scene, he went to see his brother ... in the dark between two buildings and told his brother do you want to see me die; 7) he then goes to a lady friend after having directed his brother to several locations in and around the City of Mobile and tells her I just killed a cop. I need you now more than I ever needed you before and [asked] her to take him out of town. The question is, given these facts if they have been testified to in this trial, what, if anything, does that suggest to you as an expert as to the mental condition or mental status of Vernon Madison on April 18, 1985?
"A. [Dr. McClaren]: Those things, taken together with what Mr. Madison told me, taken together with the nature of the weapon involved, leave no doubt in my mind that at the time he was able to appreciate that he was firing a handgun in a manner dangerous to other human beings, that he had the capacity to know that was against the law. And given what he told me about the sequence of events of the night involving the weapon, I have no doubt that he had the capacity to conform his behavior to the requirements of the law had he chosen to do so."
We agree with the trial court that the above testimony indicates that Dr. McClaren rendered one opinion based upon his own personal observations and facts in evidence. However, we cannot hold that this question and answer somehow cured the error of allowing Dr. McClaren to give his opinion based upon information not before the jury, but "crucial" to his making "a very thorough evaluation"an opinion, which as the prosecutor emphasized, was based on "crucial" information not considered by the other experts. Too much emphasis was placed upon the fact that McClaren's opinion was based upon information not revealed to the jury. We are convinced from our reading of the record that his opinion was based substantially on "collateral data" that was not in evidence. Moreover, we are not concerned here with the fact that Dr. McClaren was able to render an opinion without the "collateral data"; we are concerned with the fact that the jury did not have the "crucial" information upon which Dr. McClaren based his initial opinion before it so that the jury could assess the weight to be given Dr. McClaren's opinion, as instructed by the trial court. The jury had no basis whatsoever upon which to determine the truth or basis of knowledge of this "collateral data." In addition, Dr. McClaren's testimony certainly implied that the sources of this so-called "collateral data" supported the conclusion of the appellant's sanity. In effect, this inference presented hearsay problems for the appellant because he was unable, in most instances, to attack the truth or basis of each source's opinion.
Further, we do not agree with the trial court's finding that the testimony of Dr. *73 McClaren is cumulative of the testimony of the other state medical experts and is, therefore, harmless. There was a substantial difference in the testimony of Dr. McClaren and that of the other state medical experts, and the prosecutor emphasized this difference. The prosecutor especially relied on the testimony of Dr. McClaren in rebutting the appellant's evidence of insanity. He urged the jury to give special weight to Dr. McClaren's testimony, because he was the only medical expert who had gone beyond medical records and interviews with the appellant to utilize "collateral data" in reaching his conclusion. We note that the district attorney's argument that the instant case is distinguishable from Wesley because, in Wesley only one expert testified for the prosecution is based upon an incorrect assumption: in Wesley, in fact, two experts testified for the prosecution. See 575 So.2d at 127. In addition, we find nothing in the record to support the state's contention in brief that the record offers the "clear impression" that the parties agreed not to be bound, in examining the expert witnesses, by the traditional rule of evidence referred to above. Nor do we find that the appellant invited error the state alleges.
As we have noted, no timely objection was made by the appellant to the testimony of Dr. McClaren; thus we review this issue under the "plain error" standard prescribed by A.R.App.P. 45A. "While this failure to object does not preclude review in a capital case, it does weigh against any claim of prejudice." Ex parte Kennedy, 472 So.2d 1106, 1111 (Ala.1985), cert. denied, 474 U.S. 975, 106 S.Ct. 340, 88 L.Ed.2d 325 (1985) (emphasis in original). Rule 45A requires that in cases where the death penalty has been imposed, this court notice any plain error or defect in the proceedings under review, whether or not brought to the attention of the trial court, and take appropriate action when such error has or probably has adversely affected the substantial right of the appellant. The Alabama Supreme Court has adopted federal case law defining plain error, holding that "`[p]lain error' only arises if the error is so obvious that the failure to notice it would seriously affect the fairness or integrity of the judicial proceedings," Ex parte Womack, 435 So.2d 766, 769 (Ala.), cert. denied, 464 U.S. 986, 104 S.Ct. 436, 78 L.Ed.2d 367 (1983) (quoting United States v. Chaney, 662 F.2d 1148, 1152 (5th Cir.1981)).
After reviewing the evidence in this case and giving due consideration to the authorities set out above, we find that the admission of Dr. McClaren's testimony giving his opinion of the mental condition of the appellant at the time of the commission of the offense charged, which was based partly on facts not in evidence, constituted an error so obvious that the failure to notice it seriously affected the fairness or integrity of the proceedings. Ex parte Womack. We further find that the admission of the testimony "has or probably has adversely affected the substantial right of the appellant." Rule 45A. We have no choice but to hold that the admission of Dr. McClaren's testimony constituted plain error requiring reversal of the appellant's conviction.[5]
Without addressing any other issue, we caution that this opinion is not to be understood as indicating that any of the other issues presented by the appellant lack merit.
REVERSED AND REMANDED.
BOWEN, TAYLOR and McMILLAN, JJ., concur.
MONTIEL, J., dissents without opinion.

ON APPLICATION FOR REHEARING
PATTERSON, Presiding Judge.
The appellee, State of Alabama, filed its application for rehearing and motion to add or correct facts pursuant to Rule 39(k), A.R.App.P, with supporting brief, on September 4, 1992. In its brief supporting its *74 application for rehearing, the appellee raises two issues.
First, it contends that this court erroneously found that the admission of Dr. Harry Albert McClaren's testimony, giving his opinion as to the appellant's mental condition at the time of the commission of the offense constituted plain error, and that if the admission of Dr. McClaren's testimony was error, under the facts and circumstances of the case we should have found the error harmless. Second, it contends that this court was in error in interpreting Ex parte Wesley, 575 So.2d 127 (Ala.1990), to require that the statements and comments of lay persons upon which Dr. McClaren partly based his opinion as to the mental condition of the appellant must be in evidence.
After considering the appellee's application for rehearing, its brief in support thereof, and reviewing our opinion of August 21, 1992, we are not persuaded to alter or change our holding as urged by the appellee in his first contention set out above. We think that our opinion of August 21 sufficiently addresses this contention and that further discussion is unnecessary.
We find no merit in the appellee's second contention, and deem further discussion of that issue unnecessary. Thus, the application for rehearing is due to be overruled. We have considered the appellee's Rule 39(k), A.R.App.P., motion, and finding it unnecessary to correct or add additional facts to our opinion, the motion is due to be denied.
APPLICATION FOR REHEARING OVERRULED; RULE 39(k) MOTION DENIED.
BOWEN, TAYLOR and McMILLAN, JJ., concur.
MONTIEL, J., dissents without opinion.
NOTES
[1] Section 13A-5-40(a)(5), Code of Alabama 1975, provides: "Murder of any police officer, sheriff, deputy, state trooper, federal law enforcement officer, or any other state or federal peace officer of any kind, or prison or jail guard, which such officer or guard is on duty or because of some official or job-related act or performance of such officer or guard...." It is an element of the § 13A-5-40(a)(5) capital offense of murder of a law enforcement officer that the defendant know or reasonably should know that the person he is murdering is a law enforcement officer on duty. Ex parte Murry, 455 So.2d 72, 78 (Ala.1984).
[2] Section 13A-5-46(f), Code of alabama 1975, requires that an advisory verdict recommending death be based on a vote of at least 10 jurors.
[3] There was some mention of self-defense during the trial. Dr. Barry C. Amyx, a psychiatrist for the defense who testified about the appellant's mental condition at the time of the shooting, stated that he thought that the appellant believed he killed the victim in self-defense. Dr. Harry Albert McClaren, a psychologist and a witness for the state, testified that the appellant told him that the victim asked him to leave, that he thought the victim reached for something, and that he shot twice into the dark. In addition, in an unsworn written statement of the appellant read to the trial court during the second sentencing hearing, the appellant indicated that he shot the officer to protect himself. Self-defense was not urged during the trial or in the appellant's brief on appeal. The trial court did not charge the jury on self-defense nor was such a charge requested. It is obvious that a self-defense theory was not advanced because such a theory could not have been supported by the undisputed facts.
[4] Dr. McClaren also referred to "an affidavit from the psychologist who had done monitoring [of] him near Atmore." We assume, for purposes of this discussion, that this affidavit and the memorandum or statement from Mr. Bivins are the same.
[5] Having found plain error in the admission of Dr. McClaren's testimony, which requires reversal of this case, it is unnecessary to review the trial court's denial of the motion for a new trial. However, in view of the plain error, the granting of the motion for a new trial would have been proper.