SMITH, Justice.
 

 The petitioner, Jamie Ray Mills, was convicted of three counts of capital murder for the killings of Floyd Hill and Vera Hill, and he was sentenced to death. The Court of Criminal Appeals ultimately affirmed Mills’s convictions and sentences.
 
 See Mills v. State,
 
 62 So.3d 553 (Ala.Crim. App.2008) (remanding with instructions)
 
 (“Mills
 
 /”);
 
 Mills v. State,
 
 62 So.3d 553, 573 (Ala.Crim.App.2008) (opinion on return to remand)
 
 (“Mills II”).
 
 This Court granted Mills’s petition for the writ of certiorari, and we now affirm the judgment of the Court of Criminal Appeals affirming Mills’s convictions and death sentences.
 

 Facts and Procedural History
 

 In
 
 Mills I,
 
 the Court of Criminal Appeals quoted the trial court’s lengthy description of the details of the killings and the surrounding circumstances:
 

 “ ‘During the late afternoon of June 24, 2004, the defendant, 30 year old Jamie Ray Mills, and his common-law wife, JoAnn Mills, went to the home of Floyd and Vera Hill on County Road 54 in Guin, Marion County, Alabama, for the purpose of robbing them.... Mrs. Hill, 72 years old, was diabetic and in poor health and was cared for by her husband of 55 years, Floyd Hill, a spry gentleman 15 years her senior. At 87 years old, Mr. Hill cared for the needs of his ailing wife, to include administering her prescription drugs, which he kept in a locked tackle box on the kitchen table. To ensure that her prescription drugs were administered properly and timely, he set his alarm clock to alarm every four hours. Although the Hills lived alone, their adult grandchildren who resided in the area frequently checked on their grandparents. Although both Hills were retired, they frequently held yard sales, no doubt more so to keep themselves occupied and working than to augment their Social Security income. Mr. Hill was known by the employees of the local Amoco service station (where defendant Mills was last employed prior to the murders) to carry large sums of cash in his pocket, always paying for his gas in cash.
 

 “ ‘Though Mills denied knowing either of the Hills, there was evidence from which the jury could have concluded that Mills, out of work at the time, certainly did know the Hills and preconceived a plot to rid them of their cash ... and, then brutally executed them with a machete, tire tool and ball-peen hammer. A detailed factual account of this horrendous, gutless and cowardly act follows.
 

 “ ‘Shortly after dark on June 24, 2004, following repeated failed attempts by Angela Jones to check on her grandparents by phone, Jones went to the residence of her grandparents, Floyd and Vera Hill. It appeared as if the Hills were home; however, the door was locked and knocks on the door resulted in no response. Angela summoned the Guin Police Department for a welfare check. Officer Larry Webb arrived at the residence in approximately three or four minutes. Upon Webb’s arrival, he was informed by Angela Jones that her family had spoken to the Hills shortly after 2:00 p.m., at which time they were fine. Officer Webb and Mrs. Jones then knocked on the doors and windows with no response from the Hills. Webb called the Hills’ home from his cell phone. It was detected that the phone was ringing on his cell phone, but there was no noticeable ring coming from inside the Hills’ home. Officer Webb then
 
 *577
 
 shined his flashlight into the house from the front porch, and Angela noticed that Vera Hill’s bed was empty and made, and her walker was in the living room. Mr. Hill’s alarm was sounding for Mrs. Hill’s medication, but no one stirred in the home. Mrs. Jones became fearful that something was terribly wrong. Webb then moved to the pre-fabricated building on the property (enclosed with x-type lattice and polyethylene type plastic) where the Hills had yard sale items stored. Because the door was padlocked, Webb pulled a small bench to the door and climbed up on the bench to look over the door.
 

 “ ‘Officer Webb saw Floyd Hill lying on his back at the rear of the building in a pool of blood with a bloody towel thrown over his face. Mr. Hill’s walking cane was across his lower legs. Webb then saw Vera Hill lying on her right side just inside the door. She was in a pool of blood and her head and face were bloody. Vera Hill moved her left arm.
 

 “‘At approximately 8:42 p.m., Webb notified 911 to send an ambulance, and then called for additional backup (Guin Police Chief Bryan McCraw and District Attorney Jack Bostick). Webb cut the plastic wall and tore away the lattice to gain entrance into the building where he checked Vera Hill’s condition. She was still breathing. Webb moved to Floyd Hill and found him to be cold to the touch with no pulse. Webb then noticed several long bloody gashes on Mrs. Hill’s head. When asked what happened, Vera Hill repeatedly stated, “Let me out of here.” Once medical assistance had arrived, Vera Hill was transported by ambulance to the Winfield hospital. Floyd Hill was pronounced dead at the scene.
 

 “ ‘The scene was secured and a joint investigation was initiated by the Guin Police Department, the Marion County District Attorney’s Office, and the Alabama Department of Forensic Science. The crime scene was processed, photos were taken, blood samples were collected, and Vera Hill’s clothing and fingernail clippings were obtained.
 

 “(During the processing of the victims’ home and belongings, it was discovered that Floyd Hill’s wallet, Vera Hill’s purse, and a green padlocked tackle box containing Vera Hill’s medication had been taken from the residence along with a police scanner, and the Hills’ phone, which had been cut from the phone line.
 

 “ ‘... Upon completion of the autopsy of Floyd Hill, the cause of death was determined to be blunt and sharp force injury to the head and neck.
 

 ‘“Vera Hill later died on September 12, 2004 at the home of her daughter, Brenda Barger, while under the care of Hospice, two and a half months after having been transferred from the Win-field hospital to UAB Hospital in Birmingham, Alabama, where she was treated for brain injuries, a depressed skull fracture on the back of the head, fractures around her left eye, fractures to the nasal cavity, broken/fractured neck, and crushed hands.... Upon completion of the autopsy of Vera Hill, the cause of death in her case was determined to be complications of blunt head trauma.
 

 “ ‘At approximately 11:15 p.m. on June 24, 2004, Marion County District Attorney Investigators Tommy Moore and Ken Mays interviewed the Hills’ next door neighbor, Jennifer Yaden, at which time they were informed that Ya-den had noticed a white late model four-door sedan going by her house several times earlier that day. She also ob
 
 *578
 
 served this same vehicle parked in the Hills’ drive. At approximately 12:05 a.m. on June 25, 2004, Investigators Moore and Mays returned to the crime 'scene and discussed with Guin Police Chief Bryan McCraw and Officer Larry Webb the information they had obtained from Yaden. Both McCraw and Webb advised the investigators of a local man named Jamie Mills who drove a white car matching that described by Yaden. At this point, a patrol unit was sent to the residence of Jamie and [his] wife, JoAnn Mills, but it appeared as if no one was home. Investigator Moore asked Chief McCraw to send a car to the Mills[es]’ residence on a regular basis to see if the Mills[es] were home for questioning.
 

 “ ‘At 9:45 a.m. on June 25, 2004, Guin Police Department Officers G.B. Blay-lock and Stanley Webb arrived at the Mills[es]’ residence to find Jamie and JoAnn Mills attempting to leave their residence in a small white 1990 two-door Nissan Infiniti M30. The officers pulled crossways of the drive, blocking the Mills[es]’ attempted exit. Officer Blay-lock then asked Jamie Mills to back the car up in the drive so that Blaylock could talk to him. After doing so, Jamie Mills was then transported to the Guin City Hall for questioning about his whereabouts on June 24, 2004. At this time, Jamie Mills denied any knowledge of the Hills and stated that he and JoAnn were in Brilliant on June 24, 2004 looking at houses prior to going to his father’s home ... where he and JoAnn spent the night.
 

 “ ‘Marion County District Attorney Investigator Ted Smith and District Attorney Jack Bostick arrived at the Mills[es]’ residence to question JoAnn Mills, who was on probation at the time, regarding her whereabouts at the time the Hills’ attack occurred. While being questioned by Investigator Ted Smith, JoAnn Mills gave consent for the search of the Mills[es]’ home, white two-door sedan, and the trunk of the vehicle. In plain view in the car trunk was a green tackle box with a cut padlock matching the description of the tackle box in which Vera Hill’s medication was kept. Also in plain view was a large blue duffel bag that appeared to be splattered with blood. At this time, JoAnn Mills was read her
 
 Miranda
 
 rights, but she waived her rights and gave a statement. Guin Police Chief Bryan McCraw and Officer [Larry] Webb were then called to the residence and a search warrant was obtained. The search was conducted by officers from the Marion County Drug Task Force, the [Alabama Bureau of Investigation,] and the Guin Police Department. During this time, Jamie Mills was transported back to his residence where he was later placed under arrest for capital murder and transported to the Marion County Jail.
 

 “ ‘The search of the items contained in the vehicle’s trunk revealed that the green tackle box contained numerous pill bottles with prescriptions belonging to Vera Hill. The duffel bag contained an assortment of items including one large concrete block, one pair of size 12 tennis shoes with bloodstains on them, one bloodstained pair of work pants with Jamie Mills’[s] name on the inside tab, one black t-shirt with bloodstains, one pair of size 5½ tennis shoes with bloodstains, one telephone with cut cord attached, one man’s wallet containing the driver’s license of James Floyd Hill, one ladies’ purse with papers identifying it as Vera Hill’s, one machete with blood and hair on it, one ball-peen hammer with blood on it wrapped in paper, and one lug nut tire tool. The items from inside the trunk were itemized and pho
 
 *579
 
 tographed before the car, toolbox, duffel bag and contents were handed over to forensic science for examination.
 

 “ ‘DNA analysis was later performed on the machete, hammer, tire tool, black t-shirt and black pants. Test results revealed that the primary source of blood found on the machete matched that of Floyd Hill and the secondary source matched that of Vera Hill. The blood found on the ball-peen hammer matched that of Vera Hill. The blood found on the tire tool was a mixture, with Vera Hill being the major contributor and Floyd Hill being the minor contributor. The blood on the black t-shirt matched that of Vera Hill. The blood on the pants (containing the tab with Jamie Mills’[s] name) matched that of Floyd Hill.
 

 “ ‘On August 22, 2007 during the trial of defendant Jamie Mills, JoAnn Mills testified that on June 23, 2004, she and her husband, Jamie Mills, had stayed up all night smoking methamphetamine at their residence. On Thursday, June 24, 2004, they stayed at their residence until around 5:00 p.m. before going to Webster’s Market grocery (7270 U.S. Highway 43 in Guin, Alabama) to buy cigarettes. After the cigarettes had been purchased, she and Jamie left Webster’s and stopped in Fred’s [discount] store parking lot to talk to JoAnn’s cousin, Brandy West. After leaving Fred’s parking lot, Jamie told JoAnn that he was going to talk to a man about some money and for her to just follow his lead. Upon reaching the Hills’ residence around 5:15 p.m., the Hills allowed the Mills[es] into their home where Jamie attempted to make several phone calls from the Hills’ phone as JoAnn sat and talked with the Hills. According to JoAnn, Mr. Hill obviously knew Jamie and referred to him by name. After Jamie had used the phone and both couples had talked for awhile, Vera Hill wanted to show JoAnn Mills some of their yard sale items that were stored in their shed. Due to the rainy weather, Floyd Hill unlocked the padlocked building and opened the door while Vera Hill, Jamie Mills and JoAnn waited on the porch. Floyd Hill then returned and gave the women the umbrella so they could go on to the building. Floyd Hill went back into the house to get a light fixture and then returned to the building. After the Hills had shown the Mills[es] their sale items, Jamie Mills continued to talk to Floyd Hill in the shed while the two women proceeded to walk back to the porch.
 

 “ ‘JoAnn Mills then testified that she heard a loud noise and saw a silhouette through the building’s plastic siding of what appeared to be Jamie Mills with something raised over his shoulder “with both hands, as if he was swinging something.” JoAnn Mills then followed Vera Hill back into the shed to see what had happened. Upon entering the shed, JoAnn saw Floyd Hill lying on the ground and saw Jamie Mills hit Vera Hill in the back of her head with a hammer. When Mrs. Hill attempted to get up he struck her again with the hammer.
 

 “ ‘JoAnn further stated that she stood with her eyes closed in the corner of the building as she listened to the sound of Jamie Mills repeatedly striking Floyd and Vera Hill. She could hear the sound of Jamie’s feet scuffling on the ground as he went back and forth between the two victims. After the sounds of Jamie striking the Hills stopped, JoAnn Mills was then handed a hammer, a tire tool, and a machete by Jamie Mills and witnessed Jamie Mills place a white towel over Floyd Hill’s head to silence
 
 *580
 
 the gurgling sounds coming from Mr. Hill. Jamie and JoAnn Mills then exited the shed. Jamie padlocked the door shut and the two went back into the Hills’ home. Inside the Hills’ home, Jamie and JoAnn went through the house and took a padlocked tackle box, Vera’s purse, the phone, and the police scanner before leaving the residence and returning to their residence on County-Road 88.
 

 “ ‘Upon reaching the Mills[es]’ residence, Jamie brought all the items from the Hills’ residence into the kitchen. JoAnn took a shower. Jamie and JoAnn then went through the items taken from the Hills’ residence (wallet, purse, medication contained in the green tackle box) and placed them along with the hammer, tire tool and machete in a bag. The Millsfes] recovered about $140 cash from the Hills. Jamie then took a shower and called Benji Howe, a known drug abuser in the area. Benji Howe came over to the Mills[es]’ home and purchased some pain pills. After Benji left the Mills[es]’ residence, Jamie and JoAnn placed the bag containing the items from the Hills’ residence in the shed on their property before going to Jamie’s father’s residence in Hamilton, Alabama, to play do-minos and spend the night.
 

 “ ‘The next morning, June 25, 2004, Jamie and JoAnn Mills returned to their residence to find that dogs had torn into the bag containing the bloody items from the Hills’ residence. JoAnn retrieved a large blue duffel bag and the Mills[es] placed into the bag the machete, hammer, tire tool, telephone, wallet, purse, the clothes the Mills[es] had worn at the time of the attacks, and one heavy cement block. The Mills[es] then placed the duffel bag in the trunk of their car along with the green tackle box. As the two were leaving the residence to obviously dispose of the duffel bag and tackle box, they were stopped by Guin Police Officers G.B. Blaylock and Stanley Webb.’ ”
 

 62 So.3d at 557-61.
 

 Following a jury trial, Mills was convicted of three counts of capital murder.
 
 [1]
 
 After a sentencing hearing, the jury recommended, by a vote of 11-1, that Mills be sentenced to death, and the trial court accepted the jury’s recommendation and sentenced Mills to death. Mills appealed to the Court of Criminal Appeals.
 

 The Court of Criminal Appeals remanded the case with instructions that the trial court amend its sentencing order to comply with the requirements of § 13A-5-47(d), Ala.Code 1975.
 
 [2]
 

 See Mills I,
 
 62
 
 *581
 
 So.3d at 573.
 
 [3]
 
 On remand, the trial court complied with the Court of Criminal Appeals’ instructions. On return to remand, the Court of Criminal Appeals unanimously affirmed Mills’s convictions and sentences of death.
 
 Mills II,
 
 62 So.3d at 574.
 

 In his petition to this Court, Mills raises the same four issues he argued to the Court of Criminal Appeals.
 
 [4]
 
 Additionally, invoking plain-error review under Rule 39(a)(2)(A), Ala. R.App. P., Mills’s petition presents 21 separately enumerated issues, several of which include subissues, that were not presented to the Court of Criminal Appeals. We granted certiorari to consider the following questions:
 

 1. Did the trial court commit plain error in not instructing the jury on a lesser-included offense?
 

 2. Was the admission of testimony from Dr. Kenneth Snell regarding the causes of death for Floyd and Vera plain error?
 

 3. Was the admission into evidence of the items seized from the trunk of Jamie and JoAnn Mills’s vehicle plain error?
 

 4.Did the trial court commit plain error in its instructions to the jury about weighing the aggravating circumstances and the mitigating circumstances?
 

 Discussion
 

 I.
 

 Mills argues first that “the trial court violated Mr. Mills’[s] rights to counsel and due process when it ignored counsel’s request for lesser-included-offense instructions that were supported by the evidence.” (Mills’s brief, p. 13.) Mills contends that the evidence at trial could have supported guilty verdicts on lesser offenses than capital murder. Specifically, Mills contends that the jury could have concluded (1) that he committed the murders but was so intoxicated that he could not have formed the intent necessary for a finding that he was guilty of capital murder
 
 [5]
 
 or, (2) as to counts two and three, that he did not cause Vera’s death. He further maintains that his counsel “wanted the court to give such instructions.” (Mills’s brief, p. 14.)
 

 
 *582
 
 Following the closing arguments at trial, the trial court held a conference with Mills and the attorneys regarding the jury instructions. The entirety of the discussions in the record regarding jury instructions as to lesser-included offenses is as follows:
 

 “THE COURT: ... Lesser-included offenses?
 

 “MR. WILEY [cocounsel for Mills]: The only one that we could, you know, possibly fit in that we could come up with was, you know, like murder during the course of a, you know, felony murder. I don’t know what y’all think about that or even what we think about it actually; that is to say, whether we want you to give it even if you would. I don’t know. What do you think, Jack [Bos-tick, the district attorney]? Do you think there’s a possible lesser-included offense?
 

 “MR. BOSTICK: Probably the only one would be robbery, 1st and assault, 1st on Vera if they believe she died from COPD [chronic obstructive pulmonary disease] and not from her wounds.
 

 “MR. WILEY: You’re right about that. I probably should ask you to give that one. He is right about that.
 

 “MR. MATHIS [cocounsel for Mills]: Yes.
 

 “MR. WILEY: And that was quite an oversight on our — thank you, Jack.
 

 “THE COURT: Robbery, 1st?
 

 “MR. WILEY: And assault.
 

 “THE COURT: Well, it’s perplexing to me too in a — I guess in a case like this you want to — if you have any question about it, you want to give as much — as far as the evidence will provide as far as lesser-included offenses for the defendant.
 
 I think the only way that a felony-mwrder charge would be appropriate is if there was evidence that [Mills] did not have the capacity because of methamphetamines to have a specific intent to commit capital murder.
 
 [Mills] testified he didn’t use drugs. The accomplice testified they did use drugs. So I guess I’m going to put the monkey on [Mills’s] back, and I think it’s clear that if I don’t give a felony-murder charge, I want [Mills] himself to say that he waives any — and of course, if I do that, I’m going to have to give the charge dealing with the lack of mental capacity due to intoxication and drugs, and there’s two sides to that coin too. If I do that, I don’t want the jury to infer from that that I’m saying, ‘Well, [Mills] lied on the stand about drug usage,’ but if I don’t give it and the jury — it’s either going to be capital murder, or he walks, one of the two. So I want [Mills] on the record — and I want y’all to confer with him and tell him what we’re faced with here. If I don’t give that felony-murder charge, you know, I want him to waive it on the record, and the only charge I will give will be capital murder, and then in the case of Mrs. Hill robbery, 1st and assault, 1st.
 

 “MR. WILEY:
 
 We’ve already talked about it briefly this morning as we were trying to come up with whether the, you know, the drug-induced intoxication or whatever would satisfy. We were just, you know, thinking if that would work, would we do it, but we need to confer some more.
 

 “THE COURT: Well, you need to confer with him because I think it’s clear in the caselaw I’ve looked at that even you can’t waive that; it has to be the defendant himself that would waive that. And you know,
 
 that’s
 
 — I
 
 want him to recognize, and I'm sure y’all will tell him, the disadvantages and benefits of me giving that felony-murder charge.
 

 “MR. WILEY:
 
 Yes, sir. Well, we’ll do that right now if that’s all right.
 

 
 *583
 
 “THE COURT: Please do.
 

 “(Noon recess.)
 

 “(12:55 p.m. The following took place outside the presence of the jury-)
 

 “THE COURT: Okay. The jury is in the jury room now, and I wanted to take up a couple things before I charge the jury. Mr. Mills, I had a conversation with your attorneys prior to the lunch break discussing in my charge giving lesser-included offenses of capital murder, particularly with Ms. Vera Hill, the lesser-included offense of assault in the 1st degree and robbery in the 1st degree if the jury believed that she died as a result of complications from her lung condition, heart and lung condition, rather than from blunt-force trauma. Also there were discussions regarding lesser-included offenses of capital murder being felony murder and possibly with an intoxication charge of manslaughter.
 
 Now, they informed me that it’s your desire, over their objection, but it’s your desire for me to only charge the jury as to the capital murder in Count 1 of Floyd Hill, Count 2 of Vera Hill, and then in Count 3 the capital murder of two or more people and not to give any lesser-included charges. Is that your desire?
 

 “[MILLS]: Yes, sir.
 

 “THE COURT:
 
 And you understand that that’s over your attorneys’ objection?
 

 “[MILLS]: Yes, sir.
 

 “THE COURT: And I’m not going to delve into your rationale behind that, but I know your attorneys have talked to you at length before and after the lunch break about waiving on your part any charge of any lesser-included offense. Am I right about that?
 

 “[MILLS]: Yes, sir.
 

 “THE COURT: Are you satisfied with the representation your lawyers have given you in advising you about the advantages, disadvantages and the ramifications associated with the Court not charging the jury as to any lesser-included offenses?
 

 “[MILLS]: Yes, sir.
 

 “THE COURT: Okay. And you waive those voluntarily—
 

 “[MILLS]: Yes, sir.
 

 “THE COURT: —and freely of your own free will?
 

 “[MILLS]: Yes, sir.
 

 “THE COURT: And you’ve talked to your — you’ve got three lawyers sitting over there, and it’s my understanding they advised you for the Court to give lesser-included offenses, charges on lesser-included offenses, and you of your own free will and volition have instructed them to instruct the Court not to give lesser-included charges—
 

 “[MILLS]: Yes, sir.
 

 “THE COURT: —is that right?
 

 “[MILLS]: Yes, sir.
 

 “THE COURT: Okay. That’s what I will do. I’m going to do what you have requested with full understanding of the ramifications of not giving those lesser-included charges. I do want to ask your attorneys to discuss with you one more item. In the charge on the three capital-murder charges one of the elements the State of Alabama has to prove beyond a reasonable doubt is a specific intent to kill. Now, it is the law of Alabama that voluntary intoxication, although it’s not a complete defense to murder, or in this case capital murder, it can negate a specific intent to kill. But in order to do that, it’s got to be so compelling and so strong as far as the intoxication — when I say intoxication, I’m talking about either induced by aleo-
 
 *584
 
 hoi or drugs — that you don’t know what you’re doing, the person, in essence, is drunk out of their gourd and doesn’t realize what they’re doing. And I know there’s been conflicting testimony about that, but I am prepared and I will give, if you desire, a charge on specific intent, and certainly I’ll give the charge on that being one of the elements that have to be established beyond a reasonable doubt by the State, but also when I give them that charge, I’m prepared to give them the law in Alabama as it relates to voluntary intoxication and how it can negate that, specifically, ‘For it to negate — for voluntary intoxication to negate specific intent — it has to be such that the person is totally devoid of judgment and would be unable to form a specific intent. While voluntary intoxication does not excuse crime or justify crime, its excessiveness may produce such a mental condition as to render the intoxicated person incapable of forming specific intent.’ Now, that goes toward the intent element of all three of the capital-murder charges that the [district attorney] has to prove beyond a reasonable doubt. In other words, the person intoxicated literally does not know what they’re doing in order to negate specific intent. I’m prepared to give that charge, but I want you to discuss with your attorneys the fact that you have testified, I believe, that you weren’t under the influence of drugs on this particular day, June the 24th of ‘04, that you weren’t doing drugs, and I don’t want to plant in the jury’s mind any — to discredit your testimony in that regard by giving that charge.
 

 “So if y’all would, I want y’all to discuss that with him and let me know what his desire is with regard to any charge regarding voluntary intoxication.
 

 “MR. WILEY: Yes, sir.
 

 “THE COURT: Or maybe y’all have already done that.
 

 “MR. WILEY: Well, just one second.
 

 “THE COURT: Sure.
 

 “(Discussion off the record between defendant and counsel.)
 

 “MR. WILEY:
 
 Your Honor, we’ve decided to ask you not to give the charge on voluntary intoxication.
 

 “THE COURT: Okay. And that’s your desire, Mr. Mills—
 

 “[MILLS]: Yes, sir.
 

 “THE COURT: —after consulting with your three attorneys?
 

 “[MILLS]: Yes, sir.
 

 “THE COURT: Okay. And you’ve had an opportunity to think through that and talk to your attorneys about that? And I’m not trying to delve into /all's trial tactics or anything like that, but did /all advise him for me to give it, and he independently decided he didn’t want that, or did /all — I guess I’m delving into attorney/client privilege, but—
 

 “MR. WILEY: No. That’s fine. We don’t mind that at all, Your Honor, because we understand we’re all trying to do the right thing in an important case. He was of the opinion that it shouldn’t be given, and we were of the opinion that it probably — buried in the charge with everything else that you’re going to say over a period of 20 minutes, it probably wouldn’t be anything that the jury would latch onto in a detrimental way to him.
 
 However, when we looked at it the other way, how can it be helpful to him?
 
 You know, what’s the likelihood — I mean, versus the possible detrimental effect, what’s the possibility that the jury is going to find him not
 
 guilty
 
 — if
 
 they find that he committed these murders, what’s the possibility they’re going to find him not guilty because he was so intoxicated he didn’t know what he was
 
 
 *585
 

 doing? Almost none was what we came to,
 
 so there you have it.
 

 “THE COURT: Okay. Do you understand that, Mr. Mills?
 

 “[MILLS]: Yes, sir.
 

 “THE COURT: And it’s your decision, having been advised by your attorneys, for the Court not to give any charge regarding voluntary intoxication?
 

 “[MILLS]: Yes, sir.
 

 “THE COURT: Okay.”
 

 (Emphasis added.)
 

 Thus, the record indicates that Mills’s defense counsel was initially unsure whether to request instructions regarding lesser-included offenses or voluntary intoxication. Possible lesser-included offenses identified in the transcript above were (1) felony murder as to the deaths of both Floyd and Vera, which would have been based on an instruction regarding voluntary intoxication, and (2) robbery and assault as to Vera, which would have required the jury to conclude that Mills was involved in the crimes against Vera but that he did not cause her death.
 

 For the jury to have found that Mills was guilty of a lesser-included offense such as felony murder, robbery, or assault, the jury would have had to disregard Mills’s testimony that he was not involved in the crimes. As recognized in the discussions quoted above, both the trial court and Mills’s attorneys recognized that instructions as to lesser-included offenses would have been inconsistent with Mills’s testimony and could have prompted the jury to infer that Mills’s testimony was false. Indeed, Mills’s counsel discussed that dilemma on the record: defense counsel stated that because of the likelihood the instructions would cast serious doubts on the credibility of Mills’s testimony, defense counsel ultimately advised Mills not to request instructions as to voluntary intoxication.
 

 As to instructions regarding the lesser-included offenses of robbery and assault as to the count charging Mills with the capital murder of Vera, the record indicates that after he had conferred extensively with his counsel, Mills requested the trial court not to give the jury those lesser-included-offense instructions. The trial court noted that Mills’s attorneys had advised him to request lesser-included-offense instructions but that Mills did not want those instructions. Mills responded in the affirmative when the trial court asked if he was satisfied with the advice of his attorneys and whether he had a “full understanding of the ramifications of not giving those lesser-included charges.”
 

 Mills contends that his defense counsel, and not Mills himself, had the responsibility for making the decision whether to request instructions on possible lesser-included offenses. He argues that the decision to request lesser-included-offense instructions is “strategic” and “tactical” in nature and, he says, is therefore reserved exclusively for defense counsel. Consequently, he argues that the trial court erred in following Mills’s wishes regarding lesser-included-offense instructions rather than permitting his attorneys to decide whether to request those instructions.
 

 As an initial matter, it is not clear from the record that Mills’s attorneys would have requested instructions on lesser-included offenses.
 
 [6]
 
 Although the trial court noted that Mills’s “all-or-nothing” strategy was “over [his] attorneys’ objection,” de
 
 *586
 
 fense counsel later advised Mills not to seek the voluntary-intoxication instruction. Furthermore, at the completion of the trial court’s instructions to the jury, Mills’s attorneys stated that they had no objections to the charges. Finally, as noted above, a lesser-included-offense instruction would have been inconsistent with Mills’s testimony that he did not commit the murders and could have implicitly suggested that Mills’s trial testimony was false. Thus, we are not persuaded by Mills’s contentions that his attorneys necessarily would have requested any lesser-included-offense instructions if the trial court had recognized his attorneys as having the ultimate authority to do so.
 

 The State cites Rule 1.2, Ala. R. Prof. Conduct, and
 
 Burton v. State,
 
 651 So.2d 641 (Ala.Crim.App.1993),
 
 aff'd,
 
 651 So.2d 659 (Ala.1994), for the proposition that a trial court does not interfere with the attorney-client relationship by following the defendant’s wishes regarding trial strategy. Rule 1.2 states that an attorney is to “abide by [his] client’s decisions concerning the objectives of representation.” In
 
 Burton,
 
 the appellant argued that the trial court had interfered with his attorney-client relationship during the penalty phase by calling two of his codefendants as witnesses “after his attorney had told the court that [the witnesses] could add nothing that would help the appellant in mitigation.” 651 So.2d at 656. The record revealed, however, that the appellant clearly had wanted the two witnesses to testify; indeed, the trial court had conducted “a lengthy colloquy with the appellant concerning his desire to have his two codefendants testify at the penalty phase of the proceedings.” 651 So.2d at 656. Citing Rule 1.2, Ala. R. Prof. Conduct, the Court of Criminal Appeals held that “[t]here was no interference with the attorney-client relationship here, when the trial court was honoring the appellant’s wishes.” 651 So.2d at 656.
 

 The State also cites
 
 Scott v. State,
 
 937 So.2d 1065 (Ala.Crim.App.2005), in which the appellant, Scott, argued that the trial court had “ ‘interfered’ with defense counsel’s trial strategy and ordered counsel to call to the stand three witnesses Scott wanted to testify and who defense counsel believed would be harmful to the case.” 937 So.2d at 1071-72. The Court of Criminal Appeals rejected Scott’s argument. Among other things, the court noted that the trial court, as the trial court had done in
 
 Burton, supra,
 
 conducted an extensive colloquy with Scott on the issue. Additionally, the trial court allowed defense counsel several hours to discuss the matter with Scott. Moreover, defense counsel formally objected to the trial court’s allowing Scott to decide which witnesses to call, and defense counsel moved for a mistrial, arguing that the trial court erroneously allowed Scott to decide matters of trial strategy. Finally, the Court of Criminal Appeals, quoting
 
 Burton,
 
 651 So.2d at 656, held that there was no error because “ ‘there was no interference with the attorney-client relationship.’ ” 937 So.2d at 1074.
 

 The State argues that
 
 Burton
 
 and
 
 Scott
 
 support the trial court’s failure to give lesser-included-offense instructions in the present case. The State contends that
 

 “the holdings of
 
 Burton
 
 and
 
 Scott
 
 do not suggest that a trial court must always submit to the desires of a defendant over the decisions of trial counsel regarding matters of trial strategy. Instead, each case simply holds that a trial court does not commit error for following what a defendant requests.”
 

 (State’s brief, p. 29.)
 

 Mills argues, however, that
 
 Burton
 
 and
 
 Scott,
 
 decisions of the Court of Criminal Appeals, are not binding on this Court and that we should reject those cases because,
 
 *587
 
 Mills argues, those decisions “fl[y] in the face of’ certain decisions of the United States Supreme Court that Mills contends stand for the proposition that defense counsel has exclusive control over all matters of trial strategy. (Mills’s brief, p. 29 n. 8.)
 

 Among the United States Supreme Court decisions Mills cites is
 
 Florida v. Nixon,
 
 543 U.S. 175, 187, 125 S.Ct. 551, 160 L.Ed.2d 565 (2004), in which the Supreme Court stated:
 

 “An attorney undoubtedly has a duty to consult with the client regarding ‘important decisions,’ including questions of overarching defense strategy.... That obligation, however, does not require counsel to obtain the defendant’s consent to ‘every tactical decision.’ ... But certain decisions regarding the exercise or waiver of basic trial rights are of such moment that they cannot be made for the defendant by a surrogate. A defendant, this Court affirmed, has ‘the ultimate authority” to determine ‘whether to plead guilty, waive a jury, testify in his or her own behalf, or take an appeal.’ ... Concerning those decisions, an attorney must both consult with the defendant and obtain consent to the recommended course of action.”
 
 [7]
 

 Mills also cites, for example,
 
 Taylor v. Illinois,
 
 484 U.S. 400, 418-19, 108 S.Ct. 646, 98 L.Ed.2d 798 (1988), in which the United States Supreme Court stated:
 

 “Although there are basic rights that the attorney cannot waive without the fully informed and publicly acknowledged consent of the client, the lawyer has— and must have — full authority to manage the conduct of the trial. The adversary process could not function effectively if every tactical decision required client approval.”
 
 [8]
 

 (Footnote omitted.) The gist of Mills’s arguments in this regard is that the decision whether to request a lesser-included-offense instruction is not one over which a defendant has “ultimate authority”; therefore, he says, the trial court errs if it allows the defendant to make the decision whether to request a lesser-included-offense instruction.
 

 In support of his position, Mills cites the decision of the Colorado Supreme Court in
 
 Arko v. People,
 
 183 P.3d 555 (Colo.2008). In
 
 Arko,
 
 the defendant was convicted of attempted reckless manslaughter. On appeal, he argued “that the trial court erroneously refused his trial counsel’s request to instruct the jury on the lesser non-
 
 *588
 
 included offense of third-degree assault,” and he contended “that the trial court was obligated to submit this instruction to the jury, even though he himself objected to the submission of this instruction.” 183 P.3d at 557.
 

 The Colorado Supreme Court ultimately held that “the decision to request a lesser offense instruction is strategic and tactical in nature, and is therefore reserved for defense counsel.” 183 P.3d at 558. In reaching that conclusion, the Colorado Supreme Court relied in part on the commentary to Standard 4-5.2 in the third edition of the American Bar Association’s
 
 Standards for Criminal Justice.
 
 The court noted:
 

 “The commentary to the American Bar Association’s Standards for Criminal Justice also supports the conclusion that the decision whether to request lesser offense instructions rests with defense counsel. The current third edition overrules the previous edition that allocated the decision to request lesser offense instructions to the defendant. The commentary to the third edition states only that defense counsel must confer with the defendant regarding lesser offense instructions: ‘It is also important in a jury trial for defense counsel to consult fully with the accused about any lesser included offenses the trial court may be willing to submit to the jury.’
 
 ABA Standards for Criminal Justice: Prosecution Function and Defense Function,
 
 Standard 4-5.2, Commentary (3d ed. 1993).
 

 “The second edition stated that ‘the defendant should be the one to decide whether to seek submission to the jury of lesser included offenses.’
 
 ABA Standards for Criminal Justice: Prosecution Function and Defense Function,
 
 Standard 4-5.2, Commentary (2d ed. 1980). The omission of this language from the third edition indicates that under the current standards, the decision whether to submit lesser offense instructions is not a decision for the defendant, but rather for defense counsel after consultation with the defendant.
 

 “Recent cases analyzing the effect of this change have concluded that under the current ABA standards, the decision whether to request lesser offense instructions is for defense counsel.
 
 See Cannon v. Mullin,
 
 383 F.3d 1152, 1167 (10th Cir.2004) (based on change in third edition, ‘[wjhether to argue a lesser-included offense is a matter to be decided by counsel after consultation with the defendant’);
 
 Simeon [v. State],
 
 90 P.3d [181,] at 184 [ (Alaska Ct.App.2004) ] (relying in part on the change in the ABA standards to hold that the decision to request lesser offense instructions rests with counsel);
 
 Mathre v. State,
 
 619 N.W.2d 627, 629-31 (N.D.2000) (holding that defense counsel was not ineffective for failing to consult with defendant about seeking lesser offense instructions, because under current ABA standards, the decision is not one that must be made by defendant).
 

 “Additionally, we note that several jurisdictions that give the defendant ultimate authority over the decision to seek lesser offense instructions rely at least in part on the second, outdated edition of the ABA standards.
 
 See People v. Brocksmith,
 
 162 Ill.2d 224, 205 Ill.Dec. 113, 642 N.E.2d 1230, 1232 (1994) (relying on second edition of ABA standards to conclude that the decision to request lesser offense instructions should be treated as the decision to plead guilty);
 
 State v. Boeglin,
 
 105 N.M. 247, 731 P.2d 943, 945 (1987) (same);
 
 In re Trombly,
 
 160 Vt. 215, 627 A.2d 855, 857 (1993) (same). The change in the third edition undermines such reliance.”
 

 183 P.3d at 559-60.
 

 Initially, we note that the facts in
 
 Arko
 
 are distinguishable from those in the pres
 
 *589
 
 ent case in these significant respects: (1) Mills’s counsel consulted extensively with him about whether to request lesser-included-offense instructions or instructions about voluntary intoxication,
 
 see ABA Standards for Criminal Justice: Prosecution Function and Defense Function,
 
 Standard 4-5.2, Commentary (3d ed. 1993) (“the
 
 ABA Standards
 
 ”) (“It is also important in a jury trial for defense counsel to consult fully with the accused about any lesser included offenses the trial court may be willing to submit to the jury.”); (2) Mills’s counsel ultimately decided not to request an instruction regarding voluntary intoxication; and (3) at no point did Mills’s counsel clearly ask the trial court to give instructions on lesser-included offenses.
 

 More than that, however, we are not persuaded by the reasoning of the Colorado Supreme Court in
 
 Arko.
 
 The
 
 Arko
 
 court cites several cases as standing for the proposition that “the decision whether to request a lesser offense instruction is a decision for defense counsel.”
 
 Arko,
 
 183 P.3d at 559 n. 2. However, those cases involve claims alleging ineffective assistance of counsel in which the appellants challenged the decisions of their defense counsel regarding lesser-included-offense instructions.
 
 [9]
 
 From the fairly well settled proposition that the decision whether to request lesser-included-offense instructions is a tactical decision to be made by counsel and to be evaluated for reasonableness in a claim alleging ineffective assistance of counsel, the
 
 Arko
 
 court concluded that a trial court errs if it permits the defendant to make the decision regarding lesser-included-offense instructions, even if the defendant has been extensively advised by his counsel about the matter.
 

 As set forth above, the
 
 Arko
 
 court cited the commentary to the
 
 ABA Standards
 
 as “supporting] the conclusion that the deci
 
 *590
 
 sion whether to request lesser offense instructions rests with defense counsel.” That commentary indeed supports that conclusion for the limited purpose of evaluating a claim alleging that counsel has been ineffective in regard to requesting lesser-included-offense instructions. But we do not think it supports the conclusion that the defendant may never make the ultimate decision regarding a matter of trial strategy such as the one involved here.
 

 Similarly, we do not read the decisions of the United States Supreme Court in
 
 Nixon, supra,
 
 or
 
 Taylor, supra
 
 — which hold that counsel does not need the client’s approval for every tactical decision — as implying that a trial court commits reversible error if it permits the defendant to make a tactical decision after the defendant has been advised by counsel regarding that decision. Simply because defense counsel may make the tactical decision whether to request certain jury instructions, it does not follow that the trial court is required to follow the wishes of defense counsel as to every decision regarding trial strategy under any circumstance, even over the objection of the defendant.
 
 [10]
 

 Based on the foregoing, we conclude that under these circumstances — i.e., Mills received extensive time to discuss the matter with his attorneys and his attorneys did not clearly object to Mills’s decision not to request lesser-included-offense instructions — the trial court did not commit plain error in permitting Mills to decide whether to request instructions as to lesser-included offenses.
 

 II.
 

 Mills argues next that the admission of testimony at trial from Dr. Kenneth Snell regarding Floyd’s and Vera’s causes of death was plain error. The Court of Criminal Appeals addressed this issue as follows:
 

 “[Mills] also argues that the trial court erroneously allowed Dr. Kenneth Snell of the Alabama Department of Forensic Sciences (‘DFS’) to testify about the causes of the victims’ deaths and also erroneously allowed the State to introduce the autopsy reports into evidence. Specifically, he contends that the trial court should have excluded Snell’s testimony and the autopsy report because they were both based on the notes and findings of Dr. Johnny Glenn, who allegedly ‘was so mentally incapacitated at the time of the autopsies that he was unable to do much of his work and was forced to retire shortly thereafter because of advanced alzheimers disease.’ ([Mills’s] brief at p. 11.)
 

 “Glenn performed the autopsy on Floyd on June 25, 2004, and performed the autopsy on Vera on September 14, 2004. Sometime after he had performed the autopsies, Glenn left DFS because he had been diagnosed with Alzheimer’s disease. Subsequently, James Laurid-son prepared autopsy reports. At trial, Snell testified regarding the causes of the victims’ deaths.
 

 “Initially, we note that the autopsy reports were not admitted into evidence during [Mills’s] trial. Rather, the defense admitted the reports as exhibits
 
 *591
 
 only for the hearing on the admissibility of Snell’s testimony. Therefore, [Mills’s] argument regarding the autopsy reports is moot.
 

 “With regard to Snell’s testimony, during an off-the-record discussion, the defense stated that it expected the State to call a witness to testify as to the causes of death based on Glenn’s autopsy notes and based on the autopsy photographs; that Glenn was apparently incompetent at the time of the autopsies; and that it would object to the State witness drawing conclusions based on the notes of someone who was incompetent at the time he took the notes. The defense then stated that it would like to conduct a voir dire examination out of the presence of the jury to determine what information the witness intended to use to form his opinion. After the State qualified Snell as an expert, the defense conducted a voir dire examination of Snell. Thereafter, [Mills] did not argue that the trial court should exclude Snell’s testimony. Also, [Mills] did not object when Snell testified before the jury as to the causes of death. Therefore, we question whether he properly preserved this argument for our review.
 

 “Moreover,
 

 “ ‘[i]t is well settled that any challenge to the facts upon which an expert bases his opinion goes to the weight, rather than the admissibility, of the evidence.
 
 Dyer v. Traeger,
 
 357 So.2d 328, 330 (Ala.1978).’
 

 “Baker v. Edgar,
 
 472 So.2d 968, 970 (Ala.1985). During the discussion about Snell’s testimony, the district attorney informed the trial court that Glenn was no longer with DFS because he had developed Alzheimer’s disease; that he did not think that Alzheimer’s disease was an issue during Floyd’s autopsy; and that Alzheimer’s disease was possibly manifesting itself during Vera’s autopsy. Defense counsel asserted that he had read in the newspaper that Glenn had resigned in early Fall 2004 and that Glenn’s work was left in disarray.
 

 “Mathis Dyer testified that he had worked with DFS as a death investigator; that he was present during the autopsies of Floyd and Vera; that he probably made some of the photographs, but sometimes the medical examiner took some as well; and that he was present when the photographs from Floyd’s and Vera’s autopsies were made.
 

 “Gerald Howard testified that he was a forensic pathology technician at DFS; that he assisted the pathologist in all aspects of the autopsy; and that this included making photographs, helping with the identification, the evisceration, the clean up, and maintaining the facilities used to do the autopsy. He also testified that he was present during the autopsies of Floyd and Vera; that he was involved in collecting evidence, evisceration, and processing the evidence that was collected during the autopsies; that Glenn supervised, dictated, and took notes; that, if there was something Glenn needed to look at closer, he would come in, look, and make sure it was noted and photographed; and that Glenn made sure they noted anything significant that happened during the autopsy.
 

 “Snell testified that, in determining the cause of Floyd’s death, he relied on the autopsy report prepared by Laurid-son and the autopsy photographs. In determining the cause of Vera’s death, he relied on her discharge summary from the University of Alabama Birmingham Hospital, which discussed her course of treatment while she was in the hospital; an autopsy report that had been prepared by Lauridson ■ and that
 
 *592
 
 was based on Glenn’s notes; the autopsy photographs; and a diagram Glenn generated at the time of the autopsy. With regard to the autopsy reports, Snell testified that he relied strictly on the factual portions of the reports to form his opinions; that he did not initially read the opinion portions of the reports; that he made his determination as to the causes and manner of the victims’ deaths; and that he then compared his findings with Lauridson’s findings in the autopsy reports. He also testified that he reviewed a cause of death letter Glenn had written to the coroner regarding Floyd; that he did not actually rely on the letter to formulate his opinion as to the cause of death; that he simply reviewed the letter; and that, in his opinion, it was accurate. Finally, he testified that his opinion as to the causes of the victims’ deaths was in agreement with the opinions of Lauridson and Glenn; that the factual portions of the autopsy report comported with Glenn’s diagram of Vera; that the autopsy photographs and the autopsy reports were in agreement; and that, if he had had any disagreements with the opinions of Glenn and Lauridson, he would have had difficulty saying that he believed the reports to be true.
 

 “The State presented evidence that Dyer and Howard were present during the autopsy, that Howard assisted in all portions of the autopsy, and that the autopsy diagram and autopsy reports were consistent with the photographs. Also, there was not any evidence indicating that there were irregularities in the autopsies or that the photographs from the autopsies were inaccurate. Therefore, Snell properly based his opinions on the photographs and autopsy reports. Furthermore, even if Glenn was incompetent at the time of either autopsy, any challenge to the facts that formed the basis for Snell’s opinion went to the weight the jury assigned to his testimony. Therefore, there was not any error, much less plain error, in the admission of Snell’s testimony regarding the causes of death.
 
 See
 
 Rule 45A, Ala. R.App. P.”
 

 Mills I,
 
 62 So.3d at 567-69.
 

 In his materials to this Court, Mills contends that the admission of Dr. Snell’s testimony was plain error under
 
 Ex parte Wesley,
 
 575 So.2d 127 (Ala.1990), and
 
 Madison v. State,
 
 620 So.2d 62 (Ala.Crim. App.1992). In
 
 Ex parte Wesley,
 
 this Court held that the trial court committed reversible error in admitting, over the repeated objections of the defendant, the opinion testimony of a psychologist who testified that the defendant could have appreciated the criminality of his conduct on the date in question. This Court held that the opinion testimony was inadmissible because it was based on certain information in police reports and medical records that were not themselves introduced into evidence.
 
 [11]
 
 575 So.2d at 130. In
 
 Madison,
 
 the Court of Criminal Appeals considered the testimony of a psychologist who gave an opinion regarding the defendant’s mental condition at the time of the crime. 620 So.2d at 68. The defendant contended on appeal that the admission of that testimony constituted plain error because it was substantially based on information not in
 
 *593
 
 troduced into evidence. The Court of Criminal Appeals agreed with the defendant.
 

 The
 
 Madison
 
 court noted that the following information, which the psychologist relied upon in giving his opinion regarding the defendant’s mental condition, was never introduced into evidence: information received from the mother of the defendant’s child; information received from the defendant’s girlfriend; information received from the officer who arrested the defendant and took a statement from him; information received, from the chief jailer and his assistant regarding the defendant’s conduct while he was in jail; information received from a state psychologist who had observed the defendant weekly for five years while the defendant was imprisoned at Holman Correctional Facility; “portions of the ‘police file’; records from ‘the At-more, Alabama vicinity,’ presumably the same as those referred to as from Holman prison”; a taped statement the defendant gave police after his arrest; and some court-proceeding transcripts. 620 So.2d at 70. The prosecution made almost no attempt to introduce any of that evidence, and yet “[fjrom his opening statement to his final summation during the guilt phase of the trial, the prosecutor urged the jury to give special weight and consideration to [the psychologist’s] testimony.” 620 So.2d at 71.
 

 Stating that it was “apparent” that the psychologist had considered all the above information “as critical in arriving at his opinion,” the Court of Criminal Appeals noted that “[t]he inescapable conclusion is that [the psychologist’s] opinion was based substantially on information not available for the jury’s consideration, and thus, in accordance with the rule of evidence [stated in
 
 Ex parte Wesley
 
 ], his testimony was inadmissible.” 620 So.2d at 71. The Court of Criminal Appeals held that, under the circumstances, the admission of that testimony was plain error.
 

 In Mills’s case, the State argues that Dr. Snell’s testimony regarding the Hills’ causes of death was not inadmissible under
 
 Ex parte Wesley
 
 because, the State says, the facts Dr. Snell relied upon in forming his opinion were in evidence. In this regard, the State notes that Dr. Snell testified that he relied only on certain “factual” portions of the items — such as the autopsy reports prepared by Dr. James Lauridson based on Dr. Johnny Glenn’s notes or the diagram prepared by Dr. Glenn — that were not in evidence. The State contends, however, that the information in those “factual” portions of the items not in evidence was in conformity with the autopsy photographs that were introduced into evidence.
 

 The State also maintains that Dr. Snell’s testimony was admissible under the exception noted in
 
 Ex parte Wesley
 
 “where the expert is a deputy coroner who uses a toxicologist’s autopsy report as part of the basis for his testimony.” 575 So.2d at 129 (citing
 
 Jackson v. State,
 
 412 So.2d 302 (Ala.Crim.App.1982), and
 
 Woodard v. State,
 
 401 So.2d 300 (Ala.Crim.App.1981)). In both
 
 Jackson
 
 and
 
 Woodard,
 
 the Court of Criminal Appeals held that a coroner who had personally observed the bodies could give an opinion about the cause of death even though the coroner’s opinion was also based on information in autopsy reports that the coroner had not prepared.
 
 Jackson,
 
 412 So.2d at 306;
 
 Woodard,
 
 401 So.2d at 303.
 

 Mills attempts to distinguish
 
 Jackson
 
 and
 
 Woodard
 
 by arguing that unlike the coroners who testified in those cases, Dr. Snell was not present when the autopsies were performed and did not personally observe the bodies of Floyd and Vera Hill. We find that distinction unavailing. In this case, Dr. Snell relied on the photo
 
 *594
 
 graphs from the autopsies, which were admitted into evidence.
 
 [12]
 
 As noted in
 
 Mills I,
 
 there was an abundance of evidence indicating, among other things, that the photographs accurately depicted the bodies at the time the autopsies were performed and that the photographs were consistent with the factual information in the autopsy reports and the diagram.
 
 [13]
 
 Mills asserts that “the idea that a set of photographs could convey all of the detailed information, including measurements and impressions, contained in a six-page narrative autopsy report ... is unsupportable.” (Mills’s reply brief, p. 13.) But Mills has not offered any reason why Dr. Snell’s observation of the bodies by means of examining the autopsy photographs should not be considered the functional equivalent of the coroners’ personal observation of the bodies in
 
 Jackson
 
 and
 
 Woodard.
 
 Consequently, the State has shown that Dr. Snell’s testimony was admissible under the limited exception recognized in
 
 Jackson
 
 and
 
 Woodard.
 
 Moreover, even if there had been error in the admission of Dr. Snell’s testimony, the error would have been harmless. Mills did not challenge Dr. Snell’s conclusions at trial as to the causes of the victims’ deaths; rather, the sole theory Mills argued to the jury was that he did not have any involvement in the murders. Accordingly, there was no plain error in the admission of Dr. Snell’s testimony.
 

 III.
 

 Mills next contends that plain error occurred in the admission of several items seized from the trunk of his vehicle as well as the admission of forensic-testing results related to those items.
 
 [14]
 
 On the date Mills was stopped and arrested, JoAnn consented to a search of the Millses’ vehicle. Investigator Ted Smith discovered a blue duffel bag in the trunk of the Millses’ vehicle, and Officer Bryan McCraw, chief of the Guin Police Department, obtained a search warrant to examine the duffel bag and its contents. McCraw testified at trial that he recovered a machete, a tire iron, a hammer, and various clothes from the duffel bag. McCraw testified that he made an inventory of all the evidence, placed the evidence in brown paper bags, and then transported the evidence on June 24, 2004, to the Department of Forensic Sciences (“DFS”) lab located in Huntsville. The record reflects that the bags were labeled with descriptions of their contents, but the record does not indicate whether the bags
 
 *595
 
 were sealed. McCraw stated that he took the physical evidence into the DFS office and gave it to a DFS employee who logged the evidence and gave McCraw an evidence receipt. At trial, McCraw identified each item of evidence that he had secured from the trunk of the Millses’ vehicle and delivered to DFS.
 

 Robert Bass, a DNA analyst for DFS, testified about his examination and testing of the evidence. Bass gave a general description of the protocols used to test items at DFS, such as opening the bags, inventorying, and looking for stains. Bass was not questioned about who delivered the items to him or whether the items were in sealed bags when they were submitted to him. He identified the items submitted in the blue duffel bag, and he testified that he examined each item of evidence for any DNA evidence to compare to the DNA profiles of Floyd, Vera, Mills, and JoAnn. Bass found DNA profiles matching Vera’s DNA profile on blood found on the black t-shirt, the hammer, and the tire iron. He also detected a DNA profile from blood located on the blue work pants and the machete and a secondary profile on the tire iron; those profiles matched Floyd’s DNA profile. None of the DNA profiles matched Mills’s DNA profile.
 
 [15]
 

 McCraw did not identify the name of the DFS employee to whom he submitted the evidence when he relinquished control of it to DFS, and Mills contends that there is no evidence regarding the receipt, disposition, or handling of this evidence during the almost two years it was in DFS’s custody. Citing
 
 Ex parte Holton,
 
 590 So.2d 918 (Ala.1991),
 
 Birge v. State,
 
 978 So.2d 1085 (Ala.Crim.App.2007), and
 
 Ex parte Cook,
 
 624 So.2d 511 (Ala.1993), Mills contends that there were missing links in the chain of custody for that evidence and that the admission of the evidence was plain error.
 

 In
 
 Ex parte Holton,
 
 this Court stated:
 

 “[T]he State must establish a chain of custody without breaks in order to lay a sufficient predicate for admission of evidence.
 
 Ex parte Williams,
 
 548 So.2d 518, 520 (Ala.1989). Proof of this unbroken chain of custody is required in order to establish sufficient identification of the item and continuity of possession, so as to assure the authenticity of the item.
 
 Id.
 
 In order to establish a proper chain, the State must show to a ‘reasonable probability that the object is in the same condition as, and not substantially different from, its condition at the commencement of the chain.’
 
 McCray v. State,
 
 548 So.2d 573, 576 (Ala.Crim.App.1988). Because the proponent of the item of demonstrative evidence has the burden of showing this reasonable probability, we require that the proof be shown on the record with regard to the various elements discussed below.
 

 “The chain of custody is composed of ‘links.’ A ‘link’ is anyone who handled the item. The State must identify each link from the time the item was seized. In order to show a proper chain of custody, the record must show each link and also the following with regard to each link’s possession of the item: ‘(1) [the] receipt of the item; (2) [the] ultimate disposition of the item,
 
 i.e.,
 
 transfer, destruction, or retention; and (3) [the] safeguarding and handling of the item between receipt and disposition.’ Imwinklereid,
 
 The Identification of
 
 
 *596
 

 Original, Real Evidence,
 
 61 Mil. L.Rev. 145,159 (1973).
 

 “If the State, or any other proponent of demonstrative evidence, fails to identify a link or fails to show for the record any one of the three criteria as to each link, the result is a ‘missing’ link, and the item is inadmissible. If, however, the State has shown each link and has shown all three criteria as to each link, but has done so with circumstantial evidence, as opposed to the direct testimony of the ‘link,’ as to one or more criteria or as to one or more links, the result is a ‘weak’ link. When the link is ‘weak,’ a question of credibility and weight is presented, not one of admissibility.”
 

 590 So.2d at 919-20.
 

 In
 
 Ex parte Cook, supra,
 
 the defendant, who had been convicted of murder, contended that the trial court committed reversible error in admitting, over the defendant’s objection, several items of physical evidence — specifically, cigarette butts, a knife scabbard, blood-soaked gauze, socks, and jeans. This Court held that the cigarette butts, scabbard, gauze, and socks should not have been admitted over the defendant’s objection.
 
 [16]
 
 624 So.2d at 512-14. In particular, this Court stated:
 

 “A link was also missing in the chain of custody of the cigarette butts, scabbard, gauze, and socks. Although [Officer] Weldon testified that she directed and observed the collection, the State did not establish when these items were sealed or how they were handled or safeguarded from the time they were seized until Rowland[, a forensic serologist,] received them [and tested them]. This evidence was inadmissible under
 
 [Ex parte] Holton[,
 
 590 So.2d 918 (1991) ].
 

 “The cigarette butts were prejudicial to [the defendant], because they established that someone with her blood type was in [the victim’s] house. Likewise, the socks found in [the defendant’s] mobile home were prejudicial, because they were stained with blood that matched [the victim’s] type. The erroneous admission of these items probably injuriously affected [the defendant’s] substantial rights, and she is entitled to a new trial. See Rule 45, Ala. R.App. P.”
 

 624 So.2d at 514.
 

 In
 
 Birge, supra,
 
 the victim was thought to have died of natural causes and had been transported to Indiana for burial. 973 So.2d at 1087. However, after law enforcement began to investigate, the victim’s body was exhumed, and an autopsy was performed in Indiana. At trial, there was testimony that the victim had died from an overdose of prescription drugs. That cause-of-death testimony was based on the results of testing of samples taken from the victim’s body during the autopsy. 973 So.2d at 1088-89.
 

 Citing missing links in the chain of custody, the defendant in
 
 Birge
 
 objected to the introduction of the toxicology results and the cause-of-death testimony based on those results. The doctor who performed the autopsy testified at trial and stated that he had watched his assistant place the samples in a locked refrigerator. The doctor testified that the next day his assistant would have delivered the samples to a courier, who then would have delivered them to an independent lab for testing. However, neither the doctor’s assistant who secured the samples, nor the courier who transported the samples to the lab, nor the analyst who tested the samples
 
 *597
 
 testified at trial. The doctor also testified that there may have been several people who had handled the specimens during that time. Additionally, there were significant discrepancies between the doctor’s notes about the specimens in his autopsy report and the description of those specimens in the toxicology report from the independent lab that had tested them. The Court of Criminal Appeals ultimately concluded that there were numerous missing links in the chain of custody and that, because those missing links related to the crux of the case against the defendant, the trial court had committed reversible error in admitting the evidence over the defendant’s objection.
 
 [17]
 
 973 So.2d at 1094-95, 1105.
 

 In contrast to
 
 Ex parte Cook
 
 and
 
 Birge,
 
 however, the State here offered sufficient evidence on each link in the chain of custody of the evidence Mills complains of. Investigator Smith first discovered the evidence in the trunk. Officer McCraw recovered the evidence pursuant to a search warrant, inventoried it, bagged it, secured it, and delivered it to the custody of the DFS employee who logged the evidence and gave McCraw a receipt for it. Bass, who examined and tested the evidence at DFS, testified generally about the protocols used to test items at DFS, and he testified specifically about the testing he performed on the evidence.
 

 ■ Although the “tall” DFS employee to whom McCraw submitted the items was never identified and did not testify at trial, McCraw’s testimony was sufficient direct evidence indicating that the items were secured until they were delivered to DFS. As to whether there was sufficient circumstantial evidence indicating that the items remained secure until Bass tested them, the State cites
 
 Lee v. State,
 
 898 So.2d 790, 847-48 (Ala.Crim.App.2001), in which the Court of Criminal Appeals stated:
 

 “ ‘ “The purpose for requiring that the chain of custody be shown is to establish to a reasonable probability that there has been no tampering with the evidence.” ’
 
 Jones v. State,
 
 616 So.2d 949, 951 (Ala.Crim.App.1993) (quoting
 
 *598
 

 Williams v. State,
 
 505 So.2d 1252, 1253 (Ala.Crim.App.1986), aff'd, 505 So.2d 1254 (Ala.1987)).
 

 “ ““ “Tangible evidence of crime is admissible when shown to be ‘in substantially the same condition as when the crime was committed.’
 
 And it is to be presumed that the integrity of evidence routinely ham dled by governmental officials was suitably preserved ‘[unless the accused makes] a minimal showing of ill will, bad faith, evil motivation, or some evidence of tampering.’
 
 If, however, that condition is met, the Government must establish that acceptable precautions were taken to maintain the evidence in its original state.
 

 “ ““ “The undertaking on that score need not rule out every conceivable chance that somehow the [identity] or character of the evidence underwent change. ‘[T]he possibility of misidentification and adulteration must be eliminated,’ we have said, ‘not absolutely, but as a matter of reasonable probability.’ So long as the court is persuaded that as a matter of normal likelihood the evidence has been adequately safeguarded, the jury should be permitted to consider and assess it in the light of surrounding circumstances.” ’ ”
 

 “
 
 ‘Moorman v. State,
 
 574 So.2d 953, 956-7 (Ala.Cr.App.1990).’
 

 “Blankenship v. State,
 
 589 So.2d 1321, 1324-25 (Ala.Crim.App.1991).”
 

 (Emphasis added.)
 

 As noted above, Mills did not challenge the chain of custody as to any of the now-challenged items at trial. Unlike
 
 Birge,
 
 in which evidence indicated that several different unidentified individuals could have handled the specimens and there were discrepancies in the records about the specimens, nothing in the present case indicates that the items were tampered with or altered in any manner from the time McCraw relinquished custody of them to DFS until the time Bass tested them at DFS. Mills also has made no “showing of ill will, bad faith, evil motivation, or some evidence of tampering” while the items were at DFS.
 
 Lee,
 
 898 So.2d at 847.
 
 [18]
 
 Thus, this link, at worst, is a “weak” link rather than a “missing” link in the chain of custody.
 
 See Ex parte Holton,
 
 590 So.2d at 920 (“If, however, the State has shown each link and has shown all three criteria as to each link, but has done so with circumstantial evidence, as opposed to the direct testimony of the ‘link,’ as to one or more criteria or as to one or more links, the result is a ‘weak’ link. When the link is ‘weak,’ a question of credibility and weight is presented, not one of admissibility.”).
 

 Both
 
 Ex parte Cook
 
 and
 
 Birge
 
 are distinguishable from the present case in additional respects as well. Unlike
 
 Ex parte Cook,
 
 in which the officer who supervised the collection of the items did not maintain custody of them from the time they were seized until they were submitted for testing, 624 So.2d at 513, the officer who seized the physical evidence at issue in Mills’s case, Officer McCraw, testified that he collected the evidence, secured it, and maintained custody of it until he transported it to DFS. In contrast to
 
 Birge,
 
 there
 
 *599
 
 was testimony in Mills’s case from the officer, Officer McCraw, who secured and transported the evidence to the lab for testing. There also was testimony from Bass, the person who performed the forensic tests on the evidence submitted to DFS. Finally, the forensic evidence at issue, although certainly damaging to Mills, was not the “crux” of the State’s case against Mills; JoAnn’s testimony was crucial evidence in the State’s case against Mills, as was the fact that the items, even apart from forensic testing of those items, were found in Mills’s car the day after the murders. Accordingly, no plain error occurred as to this issue.
 

 IV.
 

 Finally, Mills contends that the trial court committed plain error in instructing the jury as to aggravating circumstances and mitigating circumstances. Mills first cites the following instruction from the trial court:
 

 “Now, ladies and gentlemen of the jury, if after a full and fair consideration of all the evidence in this case and all reasonable inferences therefrom you are convinced that the aggravating circumstances of capital murder during the course of robbery in the first degree and the capital murder of two or more people and any other of the aggravating circumstances which you determine the State of Alabama has proved to you beyond a reasonable doubt in today’s proceeding, if those outweigh the mitigating circumstances which have been presented by the defense, your verdict would be, ‘We, the jury, recommend the defendant Jamie Mills be sentenced to death.’ ... Or after a full and fair consideration of the evidence in this case and all reasonable inferences therefrom
 
 you are convinced that the defendant has overcome with the mitigating circumstances, that they outweigh the aggravating circumstances proven by the State beyond a reasonable doubt,
 
 then the form of your verdict would be, ‘We, the jury, recommend the defendant Jamie Ray Mills be punished by life imprisonment without parole. The vote is as follows,’ and there’s a blank for life without parole and a blank for death, and it must be signed by the foreperson and dated today’s date.”
 

 (Emphasis added.)
 

 Mills, based on the language emphasized above, argues that this instruction constitutes plain error under
 
 Ex parte Bryant,
 
 951 So.2d 724 (Ala.2002). The State, citing
 
 Ex parte McNabb,
 
 887 So.2d 998 (Ala. 2004), and
 
 Ex parte Walker,
 
 972 So.2d 737 (Ala.2007), argues that
 
 Bryant
 
 is distinguishable and that no plain error occurred. We agree with the State.
 

 In
 
 Bryant,
 
 the trial court’s instructions to the jury suggested that the jury could recommend the death sentence if the mitigating circumstances did not outweigh the aggravating circumstances. In other words, the instructions suggested that the jury could recommend the death sentence if the aggravating circumstances and the mitigating circumstances were of
 
 equal
 
 weight. 951 So.2d at 730. Even more significant to the plain-error analysis in
 
 Bryant,
 
 however, was that the trial court’s instructions invited the jury to recommend a sentence of death
 
 without finding the existence of any aggravating circumstance.
 
 951 So.2d at 730.
 
 [19]
 

 
 *600
 
 In
 
 McNabb,
 
 the sentencing instructions included the following:
 

 “Now, ladies and gentlemen, if, after a full and fair consideration of all of the evidence in the case, you are convinced beyond a reasonable doubt that at least one aggravating circumstance does exist and
 
 you are convinced that the aggravating circumstance outweighs the mitigating circumstances,
 
 then your verdict would be: ‘We, the jury, recommend that the defendant be punished by death, and the vote is as follows.... ’ However, if after a full and fair consideration of all of the evidence in the case, you determine that
 
 the mitigating circumstances outweigh any aggravating circumstance
 
 or circumstances that exist, or you are not convinced beyond a reasonable doubt that at least one aggravating circumstance does exist, your verdict should be to recommend the punishment of life imprisonment without parole.... ”
 

 887 So.2d at 1001 (emphasis added in
 
 McNabb).
 
 This Court in
 
 McNabb
 
 concluded that these instructions did not constitute plain error because the trial court had not taken the additional step of inviting the jury to recommend a death sentence without finding the existence of any aggravating circumstance. Specifically, this Court stated in
 
 McNabb:
 

 “The charge in this case was not infected with the peculiar error present in
 
 [Ex parte] Bryant[,
 
 951 So.2d 724 (Ala. 2002) ], that is, the jury in this case was not invited to recommend a sentence of death without finding any aggravating circumstance. It was that invitation in
 
 Bryant
 
 that caused the error in that case to rise to the level of plain error, rather than error reversible only by a proper objection. Thus, in this case, although the court did not specifically instruct the jury what to do if it found the mitigating and aggravating circumstances equally balanced, we cannot conclude, considering the charge in its entirety, that the error ‘seriously affect[ed] the fairness, integrity or public reputation of [these] judicial proceedings,’
 
 Ex parte Davis,
 
 718 So.2d [1166,] at 1173-74 [ (Ala.1998) ], so as to require a reversal of the sentence.”
 

 887 So.2d at 1004.
 

 Similarly, in
 
 Walker,
 
 which involved instructions regarding the balancing of the aggravating circumstances and the mitigating circumstances that were identical to the instructions in
 
 McNabb,
 
 this Court held that no plain error occurred in the sentencing instructions because “the trial court did not invite the jury in Walker’s case to recommend a sentence of death
 
 *601
 
 without finding any aggravating circumstance.” 972 So.2d at 743.
 

 In Mills’s case, the trial court’s instructions, taken as a whole, clearly informed the jury that the only way it could recommend a sentence of death was if the jury determined that aggravating circumstances existed and that those aggravating circumstances outweighed the mitigating circumstances. The trial court instructed the jury initially that “the law also provides that the punishment which should be imposed upon the defendant depends on whether any aggravating circumstances exist beyond a reasonable doubt, and if so,
 
 whether the aggravating circumstances outweigh any mitigating circumstances.”
 
 (Emphasis added.) Even in the above-quoted portion of the instructions on which Mills relies for his argument, the trial court stated:
 

 “[I]f after a full and fair consideration of all the evidence in this case and all reasonable inferences therefrom you are convinced that the aggravating circumstances ... which you determine the State of Alabama has proved to you beyond a reasonable doubt in today’s proceeding,
 
 if those outweigh the mitigating circumstances
 
 which have been presented by the defense, your verdict would be, “We, the jury, recommend the defendant Jamie Mills be sentenced to death.’ ”
 

 (Emphasis added.) Accordingly, we hold that there was no plain error in the trial court’s instructions regarding the weighing of the aggravating circumstances and the mitigating circumstances.
 
 [20]
 

 Conclusion
 

 The judgment of the Court of Criminal Appeals is affirmed.
 

 AFFIRMED.
 

 COBB, C.J., and LYONS, WOODALL, STUART, BOLIN, and PARKER, JJ., concur.
 

 MURDOCK, J., concurs in the result.
 

 SHAW, J., recuses himself.
 
 *
 

 [1]
 

 . Count I charged Mills with the intentional murder of Floyd, made capital because it was committed during a robbery,
 
 see
 
 § 13A-5-40(a)(2), Ala.Code 1975; count II charged him with the intentional murder of Vera, made capital because it was committed during a robbery,
 
 see
 
 § 13A-5-40(a)(2), Ala.Code 1975; and count III charged him with intentional murder made capital because he killed Floyd and Vera by one act or pursuant to one scheme or course of conduct,
 
 see
 
 § 13A-5-40(a)(10), Ala.Code 1975.
 

 [2]
 

 . Section 13A-5-47(d), Ala.Code 1975, provides:
 

 "Based upon the evidence presented at trial, the evidence presented during the sentence hearing, and the pre-sentence investigation report and any evidence submitted in connection with it, the trial court shall enter specific written findings concerning the existence or nonexistence of each aggravating circumstance enumerated in Section 13A-5-49, each mitigating circumstance enumerated in Section 13A-5-51, and any additional mitigating circumstances offered pursuant to Section 13A-5-52. The trial court shall also enter written findings of facts summarizing the crime and the defendant’s participation in it.”
 

 [3]
 

 . Judge McMillan concurred in the opinion, authored by Presiding Judge Baschab, remanding the case with instructions that the trial court amend its sentencing order to comply with the requirements of § 13A-5-47(d), Ala.Code 1975; Justice Shaw, then serving as a judge on the Court of Criminal Appeals, and Judge Welch concurred in the result. According to a note from the Reporter of Decisions, when the decision was initially released on June 27, 2008, Judge Welch's vote was inadvertently shown as concurring. Judge Welch’s vote was changed to reflect his correct vote.
 
 Mills I,
 
 62 So.3d at 573.
 

 [4]
 

 . Mills raised the following four issues in his appeal to the Court of Criminal Appeals:
 

 "I. The trial court’s failure to suppress evidence illegally obtained pursuant to a warrantless search constitutes reversible error.
 

 "II. The trial court erred to reversal in allowing doubtful and unreliable medical testimony concerning the cause of death of the victims.
 

 “III. The prosecutor’s concealment of a plea bargain arrangement with appellant’s co-defendant witness constitutes reversible error.
 

 "IV. The trial court erred to reversal in refusing to allow the defense to cross examine the chief witness for the prosecution concerning her psychiatric diagnosis and treatment.”
 

 (Mills’s brief to the Court of Criminal Appeals, p. 6.)
 

 [5]
 

 .Mills bases this contention on JoAnn's testimony during the State's case-in-chief that she and Mills had stayed up all night on June 23 using methamphetamine and that they both had used methamphetamine before driving to the Hills' residence on June 24.
 

 [6]
 

 . The record does not support Mills’s contention that his counsel actually requested lesser-included-offense instructions.
 
 See, e.g.,
 
 Mills's brief, p. 32 ("[T]he trial court failed to honor trial counsel’s request for lesser-included offenses-”).
 

 [7]
 

 . In
 
 Nixon,
 
 the defendant challenged his "counsel’s strategic decision to concede, at the guilt phase of the trial, the defendant’s commission of murder, and to concentrate the defense on establishing, at the penalty phase, cause for sparing the defendant’s life.” 543 U.S. at 178. The Florida Supreme Court had held that counsel’s concession, because it was made without the express consent of the defendant, "automatically rank[ed] as prejudicial ineffective assistance of counsel necessitating a new trial.” 543 U.S. at 178. The United States Supreme Court reversed the judgment of the Florida Supreme Court and held that the performance of the defendant's counsel was not automatically deficient merely because counsel had not obtained the defendant’s express consent to the strategy of conceding guilt. 543 U.S. at 187-92.
 

 [8]
 

 . The United States Supreme Court made the above-quoted statement in
 
 Taylor
 
 in response to the defendant's argument that he "should not be held responsible for his lawyer’s misconduct.” 484 U.S. at 417. The defendant's lawyer had failed to identify a defense witness in response to a pretrial discovery request, and the trial court, as a sanction for that failure to disclose the witness, refused to allow the witness to testify. The United States Supreme Court upheld the lower court’s refusal to permit the witness to testify. 484 U.S. at 401-02.
 

 [9]
 

 . The Colorado Supreme Court cited
 
 United States v. Mays,
 
 466 F.3d 335, 342 (5th Cir. 2006) (rejecting claim of ineffective assistance of counsel regarding counsel’s decision to request a manslaughter instruction; defendant wanted only self-defense argued to the jury);
 
 Tinsley v. Million,
 
 399 F.3d 796, 808 (6th Cir.2005) (rejecting claim of ineffective assistance of counsel regarding counsel’s decision not to request a self-defense instruction or lesser-included-offense instruction; this was "a permissible exercise of trial strategy” because the primary line of defense was that defendant was not the shooter);
 
 Neal v. Acevedo,
 
 114 F.3d 803, 806 (8th Cir.1997) ("[Tjrial counsel’s decision not to request the lesser-included offense instructions was reasonable trial strategy because the instructions would have been inconsistent with [the defendant’s] alibi defense.”);
 
 State v. Sheppard,
 
 270 Mont. 122, 130, 890 P.2d 754, 757 (1995) ("This Court has previously held that when defense counsel makes a tactical decision to forgo an instruction that is inconsistent with the defense, we will not find error supporting an ineffective assistance of counsel claim.”);
 
 State v. Edwards,
 
 119 Ohio App.3d 106, 111-12, 694 N.E.2d 534, 538 (1997) (“[T]his court finds that appellant’s trial counsel had the authority to make the decision to forgo a jury instruction!] on the lesser included offenses of voluntary manslaughter or involuntary manslaughter, because that decision is not so inherently personal to appellant that it could be waived only by appellant. Therefore, this court finds that the decision not to ask for an instruction on lesser included offenses is a decision that could be made by trial counsel without the express authority of the appellant. Thus, based upon a review of the record in the present case, this court cannot say that the decision of trial counsel to forgo a jury instruction on lesser included offenses to murder was unreasonable under the circumstances. Appellant has not met his burden of demonstrating that he was entitled to relief based upon his claim of ineffective assistance of counsel.”);
 
 State v. Eckert,
 
 203 Wis.2d 497, 510, 553 N.W.2d 539, 544 (Ct.App.1996) ("[W]e conclude that a defendant does not receive ineffective assistance where defense counsel has discussed with the client the general theory of defense, and when based on that general theory, trial counsel makes a strategic decision not to request a lesser-included instruction because it would be inconsistent with, or harmful to, the general theory of defense.”).
 

 [10]
 

 . In this regard, the State argues:
 

 "In Mills's view, anytime there is a disagreement between counsel and the defendant on any matter of trial strategy, and if the trial court follows any decision other than that of defense counsel, it would result in reversible error. Such a result is simply ridiculous. It strains logic to suggest that defense counsel could totally and under any circumstance deprive his client of the opportunity to pursue a strategy of complete innocence rather than seek a compromise verdict based on lesser-included offenses."
 

 (State's brief, p. 41.)
 

 [11]
 

 . The
 
 Wesley
 
 Court stated:
 

 "In the present case, the police reports and medical records that contained hearsay evidence and upon which [the psychologist] was asked to base his opinion were not offered or admitted into evidence. [The psychologist's] testimony was objected to because he was asked to base his opinion upon those records that were not in evidence.”
 

 575 So.2d at 130.
 

 [12]
 

 . Mills has not challenged the admission of the autopsy photographs into evidence.
 

 [13]
 

 . During voir dire examination. Dr. Snell testified as follows:
 

 "[THE COURT]: Have you looked at the photographs [of Vera’s autopsy] to verify the validity of the diagram?
 

 "[DR. SNELL]: Yes, sir.
 

 "Q. And does the diagram comport with the photographs?
 

 "A. Yes, sir.
 

 [[Image here]]
 

 "[THE COURT]: Did you determine whether or not the factual portions of the report of the autopsy comport with the diagram of Vera Hill?
 

 "A. Yes, sir, it does.
 

 [[Image here]]
 

 "Q. Same question with Floyd Hill?
 

 "A. There was not a diagram, but when comparing it to the photographs, they were in agreement.
 

 "Q. When you say comparing it to the photographs, you’re talking about the report of autopsy?
 

 "A. Yes, sir.
 

 "Q. You compared that to the photographs, and they are in agreement?
 

 "A. Yes, sir.’’
 

 [14]
 

 .At trial, Mills did not object to the admission of this evidence or to the State’s preservation of the chain of custody as to it; therefore, our review of this issue is for plain error.
 
 See
 
 Rule 45A, Ala. R.App. P.;
 
 Ex parte Belisle,
 
 11 So.3d 323, 334 (Ala.2008).
 

 [15]
 

 . In his closing argument, Mills's counsel argued that the fact that no forensic evidence on the machete or the tire iron was linked to Mills militated against a finding of guilt beyond a reasonable doubt.
 

 [16]
 

 . This Court held that the admission of the jeans, although error, was harmless. 624 So.2dat514.
 

 [17]
 

 . The Court of Criminal Appeals noted:
 

 "The chain of custody for the samples removed from [the victim’s] body contains several missing links; the chain of custody is so deficient in this case that we are unable to identify precisely how many people handled the samples Dr. Pless removed from Cecil's body. This is significant because Dr. Pless testified that a number of people would have handled the samples. We can infer from the record that a courier transported the samples, but we are uncertain of the date of the transfer because Dr. Pless conducted the autopsy on May 25, 2001, and testified that the samples would have been transferred to the lab the following day, but the samples were apparently not received by the analyst or analysts until May 29, 2001. We would expect that someone at the laboratory received the samples and catalogued them into a tracking system; that the person who received the samples would have placed them in a secure, temperature-controlled location until the analyst or analysts retrieved the samples for testing; that the analyst or analysts would have picked up the samples from the secure location and would have safeguarded them during the testing process to ensure that the samples were not contaminated or that the reliability of the test results was not otherwise compromised. However, all of the foregoing are matters of pure speculation because the State failed to establish the chain of custody for the samples after Dr. Pless's assistant placed them in the refrigerator. The State failed to identify any of the links who handled the evidence after Etame secured it, and it therefore could provide no information about the receipt, disposition, and safeguarding and handling of the evidence, all of which are required by
 
 Ex parte Holtonl
 
 590 So.2d 918 (Ala.1991)]. Without this necessary information, the State's chain of custody has several missing links, and missing links, the Alabama Supreme Court has said, render evidence inadmissible.”
 

 973 So.2d at 1094-95 (footnote omitted).
 

 [18]
 

 . Mills attempts to distinguish
 
 Lee
 
 as involving the introduction of physical evidence rather than the results of forensic testing of that evidence. However,
 
 Lee
 
 involved testimony about forensic testing of the evidence at issue.
 
 See
 
 898 So.2d at 848 (discussing testimony from a firearms and toolmarks examiner employed by DFS);
 
 cf.
 
 898 So.2d at 822 (quoting the prosecutor’s closing argument, which discussed the forensic analyst’s testimony).
 

 [19]
 

 . The
 
 Bryant
 
 Court explained:
 

 "In the case now before us, the jury instructions erroneously allow the conclusion that the death penalty is appropriate
 
 even if the aggravating circumstances do not outweigh the mitigating circumstances
 
 so long as the mitigating circumstances
 
 do not outweigh
 
 the aggravating circumstances. The trial judge in
 
 *600
 
 this case did not add the caveat which sufficed in
 
 [Ex parte] Trawick,
 
 [698 So.2d 162 (Ala. 1997)], that the jury was to 'recommend the death penalty
 
 only
 
 if [the jury] found that the aggravating circumstances outweighed the mitigating circumstances.’
 
 Trawick,
 
 698 So.2d at 173. Indeed, at the end of the instructions on this topic, the trial judge implicitly told the jury that it might recommend death
 
 even if the jury did not find an aggravating circumstance at all:
 
 'if you do
 
 not
 
 find that an alleged aggravating circumstance was proved, that does not
 
 automatically
 
 or
 
 necessarily
 
 mean that you should sentence Mr. Bryant to death....' (R. 1103, quoted
 
 supra.)
 
 (Emphasis added.)
 

 “No other instructions by the trial court and no other feature of the record instills us with any confidence that the jury did not, within the parameters of the erroneous instructions, base the death penalty recommendation
 
 on a finding
 
 that the mitigating circumstances
 
 did not outweigh
 
 the aggravating circumstances even though the mitigating circumstances
 
 did equal
 
 the aggravating circumstances. Such a recommendation would be contrary to § 13A-5-46(e)[, Ala.Code 1975], Therefore, the erroneous jury instructions on the topic of weighing the aggravating circumstances and the mitigating circumstances constitute plain error.”
 

 951 So.2d at 730.
 

 [20]
 

 . In the section of his brief addressing the sentencing instructions. Mills also presents arguments (1) that the trial court’s instructions improperly shifted the burden to him to prove the existence of mitigating evidence and (2) challenging certain aspects of the trial court’s instructions regarding the unanimity of the jury. Mills raised those arguments in Parts XVI.B., XVI.C., and XVI.E. of his petition for the writ of certiorari. This Court did not grant certiorari review as to those grounds, and we decline Mills’s implicit request that we do so.